Christopher Sproul (State Bar No. 126398)
Jodene Isaacs (State Bar No. 226895)
Page Perry (State Bar No 246266)
ENVIRONMENTAL ADVOCATES
5135 Anza Street
San Francisco, California 94121
Telephone: (415) 533-3376, (510) 847-3467
Facsimile: (415) 358-5695
Email:  csproul@enviroadvocates.com
Email:  jisaacs@enviroadvocates.com
Email:  page.perry@gmail.com

Fredric Evenson (State Bar No. 198059)
ECOLOGY LAW CENTER
~Monterey Bay~
P.O. Box 1000
Santa Cruz, CA 95061
Telephone: (831) 454-8216
Email: evenson@ecologylaw.com

Attorneys for Plaintiff
ECOLOGICAL RIGHTS FOUNDATION

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ECOLOGICAL RIGHTS FOUNDATION,<br><br>             Plaintiff,<br><br>    v.<br><br>PICK-N-PULL AUTO AND TRUCK DISMANTLERS and SCHNITZER STEEL INDUSTRIES, INC.,<br><br>           Defendants. | Civil Case No.<br><br>COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES<br><br>DEMAND FOR JURY TRIAL<br><br>(Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 et. seq.) |

Ecological Rights Foundation ("EcoRights"), by and through its counsel, hereby alleges:

## I.     JURISDICTION AND VENUE

1.      This is a civil suit brought under the citizen suit enforcement provisions of the Federal Water Pollution Control Act, 33 U.S.C. section 1251 *et seq.* (the "Clean Water Act" or the "CWA"). This Court has subject matter jurisdiction over the parties and subject matter of this action pursuant to CWA section 505(a)(1), 33 U.S.C. § 1365(a)(1), and 28 U.S.C. section 1331 (an action for declaratory and injunctive relief arising under the Constitution and laws of the United States).

2.      On March 21, 2015, EcoRights provided notice of violations of the CWA by Defendants Pick-n-Pull Auto and Truck Dismantlers and Schnitzer Steel Industries, Inc. (collectively "Pick-n-Pull") and of EcoRights' intention to file suit against Pick-n-Pull to the Administrator of the United States Environmental Protection Agency ("EPA"); the Regional Administrator of EPA Region IX; the Executive Director of the California State Water Resources Control Board ("State Board"); the Executive Officer of the California Regional Water Quality Control Board, Region 3 ("Regional Board"); the U.S. Attorney General, and the Defendants ("Notice Letter") as required by the CWA, 33 U.S.C. § 1365(b)(1)(A).

3.      More than sixty days have passed since notice was sent to Pick-n-Pull and the state and federal agencies. Neither the EPA nor the State of California has commenced or is diligently prosecuting a court action to redress the violations alleged in this complaint. No claim in this action is barred by any prior administrative action pursuant to section 309(g) of the CWA, 33 U.S.C. § 1319(g).

4.      Venue is proper in the Northern District of California pursuant to CWA section 505(c)(1), 33 U.S.C. §1365(c)(1), because the source of the violations is located within this judicial district.

## II.     INTRADISTRICT ASSIGNMENT

5.      Intradistrict assignment of this matter to either the San Francisco Division or the San Jose Division of the Court is appropriate pursuant to Civil Local Rule 3-2(c). The events and the property at issue which give rise to EcoRights' claims occurred in Moss Landing, Monterey

County, California. However, Plaintiff's principal place of business is to the north of the City of San Francisco, and Plaintiff's lead counsel resides in San Francisco. It also appears likely that Defendants' retained counsel resides in San Francisco. Thus, it would likely be most convenient for the parties if this case were assigned to the San Francisco Division of the Court.

## III.    **INTRODUCTION**

6.      This complaint seeks relief for alleged unlawful discharges of pollutants from Pick-n-Pull's facility located at 516 A & 516 B Dolan Road, Moss Landing, California ("the Facility") into waters of the United States in violation of the Clean Water Act and the State of California's General Permit No. CAS000001 [State Water Resources Control Board] Water Quality Order No. 92-12-DWQ, as amended by Order No. 97-03-DWQ ("Industrial Stormwater Permit").

7.      Violations of the Clean Water Act and the Industrial Stormwater Permit by small industrial sites are recognized as a leading cause of significant, cumulative impacts to the water quality of Elkhorn Slough and Monterey Bay. With every rainfall event, hundreds of millions of gallons of polluted rainwater flow off of local industrial facilities, such as Pick-n-Pull's, and pour into storm drains and into the Bay. The consensus among agencies and water quality specialists is that stormwater pollution accounts for more than half of the total pollution entering the marine environment each year.

8.      Stormwater runs off of industrial sites such as Pick-n-Pull's, causing harm to humans and aquatic life. In particular, stormwater from such industrial facilities contains suspended sediment and heavy metals such as copper, lead and zinc. Exposure and ingestion of heavy metals can cause health problems in people and aquatic animals, including neurological and reproductive effects. Fish are widely used to evaluate the health of aquatic systems because pollutants accumulate in fish, which are an important part of aquatic food chains. Heavy metals have been shown to alter physiological activity in tissues and blood of fish.

9.      High concentrations of total suspended solids ("TSS") degrades optical water quality by reducing water clarity and decreasing light available to support photosynthesis. Suspended solids have been shown to alter predator-prey relationships (for example turbid water

might make it difficult for fish to see their prey). Deposited solids alter habitat for fish, aquatic plants, and benthic organisms. TSS can also be harmful to aquatic life because numerous pollutants, including metals and PAHs, are adsorbed onto TSS. Thus, higher concentrations of TSS mean higher concentrations of toxins associated with those sediments.

10.    Pick-n-Pull's stormwater discharges contribute to the ongoing stormwater pollution problem and exemplify the epidemic of violations of industrial stormwater permits that EcoRights is seeking to eliminate or reduce. These pollution discharges can and must be curtailed for the Elkhorn Slough and Monterey Bay to be restored to ecological health.

**IV.    PARTIES**

11.    EcoRights is a non-profit public benefit corporation organized under the laws of California, with its main office in Garberville, California. EcoRights' purpose is to educate the public about environmental practices which cause harm to human health, the environment and other natural resources, and to seek redress from those harms through litigation or alternative dispute resolution. EcoRights represents citizens in protecting California's waterways from pollution, securing the multitude of benefits that flow from clean, vibrant waters: safe drinking water, abundant and diverse wildlife populations, healthy recreational opportunities, and economic prosperity from commercial fishing, tourism, and other commercial activities that depend on clean water. To further its goals, EcoRights actively seeks federal and state agency implementation of state and federal water quality laws, including the CWA, and as necessary, directly initiates enforcement actions on behalf of itself and its members.

12.    Members of EcoRights, including citizens, taxpayers, property owners, and residents, live, work, travel and recreate near Elkhorn Slough, Moss Landing Harbor, and Monterey Bay (hereinafter collectively referred to as "impacted waters"), into which Pick-n-Pull causes pollutants to be discharged. These EcoRights members use and enjoy the impacted waters for recreational, educational, scientific, conservation, aesthetic, and spiritual purposes. Pick-n-Pull's alleged discharge of stormwater containing pollutants impairs each of those uses. Thus, the interests of EcoRights' members have been, are being, and will continue to be adversely affected by Pick-n-Pull's failure to comply with the Clean Water Act and the Industrial Stormwater Permit.

13.     Defendant Pick-n-Pull Auto and Truck Dismantlers is a subsidiary of Schnitzer Steel Industries, Inc. ("Schnitzer"). Pick-n-Pull Auto and Truck Dismantlers and Schnitzer have worked together since 1989, and Pick-n-Pull Auto and Truck Dismantlers became a fully owned subsidiary of Schnitzer in 2003 as part of its Auto Parts Business unit. Pick-n-Pull staff who are located at the facility at 516 A&B Dolan Road, Moss Landing, California submit most reporting required under the Industrial Stormwater Permit.

14.     Through its various corporate and subsidiary entities, Pick-n-Pull purchases used and salvage vehicles from tow companies, private parties, auto auctions, charities and insurance companies to offer vehicles and parts for sale. At the Facility, hundreds of vehicles are stocked at a time and inventory is constantly refreshed to provide customers with a wide selection of vehicles and parts.

## V.     REGULATORY BACKGROUND

### Clean Water Act

15.     CWA section 301(a), 33 U.S.C. §1311(a), prohibits the discharge of any pollutant into waters of the United States unless the discharge is in compliance with various enumerated CWA sections. Among other things, CWA section 301(a) prohibits discharges not authorized by, or in violation of, the terms of a National Pollutant Discharge Elimination System ("NPDES") permit issued pursuant to CWA section 402, 33 U.S.C. § 1342.

16.     CWA section 402(p) requires that NPDES permits be issued for stormwater discharges associated with industrial activities.

17.     CWA section 402(b) allows each state to administer its own EPA-approved permit program for discharges. In California, the State Board and its nine Regional Boards have approval from EPA to administer an NPDES permit program for the State. The State Board and its nine Regional Boards issue individual and general NPDES permits regulating water pollutant discharges from various categories of dischargers.

18.     CWA section 505(a)(1) provides for citizen enforcement actions against any "person," including individuals, corporations, or partnerships, for violations of NPDES permit requirements and for unpermitted discharges of pollutants. 33 U.S.C. § 1365(a)(1); *see* 33 U.S.C. §

1362(5).

19.     CWA section 505(a) authorizes a citizen suit action for injunctive relief. 33 U.S.C. § 1365(a). CWA violators are also subject to an assessment of civil penalties of up to $32,500 for all violations occurring on or after March 15, 2004 through January 12, 2009, and $37,500 per day per violation for violations occurring after January 12, 2009. CWA § 309(d), 33 U.S.C. § 1319(d) and 40 C.F.R. §§ 19.1 - 19.4.

**State Regulations**

20.     Elkhorn Slough is heavily degraded from pollutant loading. This is officially recognized by the EPA, the State Board and the Regional Board, which have placed Elkhorn Slough on the CWA section 303(d) list of waters that are so polluted that they do not meet applicable water quality standards. The Regional Board's Basin Plan is the master policy document setting forth the legal, technical, and programmatic bases of water quality regulation in the Region. Among other things, the Basin Plan includes the water quality objectives needed to protect the designated beneficial water uses. The Basin Plan sets forth narrative water quality objectives for sediment, settable matter, and suspended materials, as well as narrative objectives for not impairing water quality with oil sheens, turbidity, or other nuisance conditions. The Basin Plan also includes numeric water quality standards for pH, dissolved oxygen and toxic pollutants as well as site specific objective for certain pollutants of concern such as copper, lead, and zinc.

21.     In addition, a rule promulgated by EPA known as the California Toxics Rule ("CTR") sets Water Quality Standards ("WQS") for 126 toxic priority pollutants in California's rivers, lakes, enclosed bays, and estuaries. The CTR, which applies to Monterey Bay and tributaries such as Elkhorn Slough, and includes limits for several toxic metals.

**The General Industrial Stormwater Permit**

22.     In California, the State Board has elected to issue a single, statewide general permit applicable to all stormwater discharges associated with industrial activity. The Industrial Stormwater Permit is an NPDES permit pursuant to CWA section 402(p), 33 U.S.C. § 1342(p). To discharge stormwater lawfully in California, industrial dischargers must secure coverage under the Industrial Stormwater Permit and comply with its terms or obtain and comply with an individual

1    NPDES permit.

2    23.    The Industrial Stormwater Permit contains certain absolute prohibitions.

3    Discharge Prohibition A(1) of the Industrial Stormwater Permit prohibits the direct or indirect

4    discharge of materials other than stormwater ("non-stormwater discharges"), which are not

5    otherwise authorized by an NPDES permit, to the waters of the United States. Discharge

6    Prohibition ¶ A.2 of the Industrial Stormwater Permit prohibits stormwater discharges that cause or

7    threaten to cause pollution, contamination, or nuisance. Receiving Water Limitation ¶ C.1 of the

8    Industrial Stormwater Permit prohibits discharges that adversely impact human health or the

9    environment. Receiving Water Limitation ¶ C.2 of the Industrial Stormwater Permit prohibits

10   discharges that cause or contribute to an exceedance of any applicable water quality standard

11   contained in a Statewide Water Quality Control Plan or the applicable Regional Board's Basin

12   Plan.

13   24.    In addition to absolute prohibitions, the Industrial Stormwater Permit contains a

14   variety of substantive and procedural provisions with which dischargers must comply. At a

15   minimum, dischargers must employ measures to reduce or eliminate stormwater pollution that

16   constitute the Best Available Technology Economically Achievable ("BAT") and the Best

17   Conventional Pollutant Control Technology ("BCT"). Industrial Stormwater Permit, Effluent

18   Limitation B(3).

19   25.    Dischargers must develop and implement a Stormwater Pollution Prevention Plan

20   ("SWPPP") at the time industrial activities begin. *Id.* at ¶ A(1) and Provision § E.2. The SWPPP

21   must identify and evaluate sources of pollutants associated with industrial activities that may affect

22   the quality of storm and authorized non-stormwater discharges from the facility. *Id.* at ¶ A.2. The

23   SWPPP must identify and implement site-specific best management practices ("BMPs") to reduce

24   or prevent pollutants associated with industrial activities in stormwater and authorized non-

25   stormwater discharges. *Id.* The SWPPP must include BMPs that achieve pollutant discharge

26   reductions attainable via BAT and BCT. *Id.*, Effluent Limitation ¶ B.3.

27   26.    The SWPPP must include: a narrative description and summary of all industrial

28   activity, potential sources of pollutants, and potential pollutants; a site map indicating the

stormwater conveyance system, associated points of discharge, direction of flow, areas of actual and potential pollutant contact, including the extent of pollution generating activities, nearby water bodies, and pollutant control measures; a description of stormwater management practices; a description of the BMPs to be implemented to reduce or prevent pollutants in stormwater discharges and authorized non-stormwater discharges; the identification and elimination of non-stormwater discharges; the location where significant materials are being shipped, stored, received, and handled, as well as the typical quantities of such materials and the frequency with which they are handled; a description of dust and particulate generating activities; and a description of individuals and their current responsibilities for developing and implementing the SWPPP. *Id.* at ¶¶ A.1-A.10.

27.     The Industrial Stormwater Permit also requires facility operators to properly operate and maintain any facilities and systems of treatment and control installed or used to achieve compliance with the conditions of the Industrial Stormwater Permit and requirements of the SWPPP at all times. Industrial Stormwater Permit, § C. The SWPPP and site maps must be assessed annually and revised as necessary to insure accuracy and effectiveness. *Id.* at ¶¶ A.1, B.3, and 4.

28.     Facility operators are required to develop and implement a monitoring and reporting program ("MRP") when industrial activities begin at a facility. *Id.* at ¶ B.1 and Provision ¶ E.3. The MRP must ensure that stormwater discharges are in compliance with the Discharge Prohibitions, Effluent Limitations, and Receiving Water Limitations specified in the Industrial Stormwater Permit. *Id.* at ¶ B.2. The MRP must ensure that practices at the facility to prevent or reduce pollutants in stormwater and authorized non-stormwater discharges are evaluated and revised to meet changing conditions at the facility, including revision of the SWPPP. *Id.*

29.     Pursuant to the monitoring and reporting requirements of the Industrial Stormwater Permit, facility operators must conduct ongoing visual observations of stormwater and non-stormwater discharges and record responsive measures taken to eliminate unauthorized non-stormwater and to reduce or prevent pollutants in stormwater and authorized non-stormwater discharges. *Id.* at ¶¶ B.3, 4. Facility operators must collect samples of stormwater discharges from

*all* locations where stormwater may be discharged from the facility. *Id.* at ¶¶ B.5, 7. Facility operators must submit Annual Reports to the Regional Board accurately reporting their monitoring activity. *Id*. § B: MRP Requirements, ¶ 14 & § C: Standard Provisions, ¶¶ 9 and 10.

## VI.     <u>STATEMENT OF FACTS</u>

30.     In most of the Monterey Bay area, stormwater drains untreated either directly, or through the storm drain system, into the Bay and its tributaries. Among those who specialize in the field of water quality locally, it is well known and commonly understood that stormwater pollution accounts for the majority of pollution entering the Monterey Bay and its watershed each year. With every rainfall event, hundreds of millions of gallons of polluted rainwater, originating from area industries, pour into the Bay and its tributaries.

31.     Pick-n-Pull operates an auto and truck dismantling and recycling facility located at 516A &B Dolan Road, Moss Landing, California. The Facility is located northerly of the intersection of Via Tanques Road and Dolan Road, on Via Tanques Road, in the Moss Landing area of northern Monterey County. Dolan Road, a well-used county arterial road, runs east-west to the south of the Park and connects up to Highway 1 at Moss Landing.

32.     Activities at the Facility include stocking hundreds of vehicles at a time and constantly refreshing inventory to provide customers with a wide selection of vehicles and parts. As vehicles arrive, Pick-n-Pull employees inspect them, allegedly make efforts to remove and recycle vehicle fluids and hazardous materials, and then place the vehicles in the yard on supports where customers can access them. Customers pay an admission fee and bring their own tools to pull the parts themselves. Vehicles are set on customized supports to raise them off the ground to ensure easy access for customers to pull parts. Pick-n-Pull provides free use of wheelbarrows and engine hoists. In the process of recycling thousands of vehicles per year, Pick-n-Pull employees remove and recycle usable parts from the vehicles. The remaining vehicle hulks are crushed and sold to metal recyclers which process them into sellable recycled metal. Discharges of stormwater flow off the Facility at four different discharge points which then discharge directly into Elkhorn Slough.

33.     The operations at the Facility occurs outdoors and are causing pollutants to be

exposed to rainfall. At the Pick-n-Pull Facility, vehicles, parts and scrap metal materials are mostly stored uncovered in the outdoor portion of the Facility, primarily in unpaved areas of the Facility. Stormwater comes into contact with these scrap vehicles and parts, scrap materials and the other pollutants at the Facility. The Facility lacks sufficient and/or sufficiently well-maintained berms or other structural controls to retain stormwater on the Facility. Pick-n-Pull does not sufficiently treat contaminated stormwater prior to discharge from the Facility. The large number of trucks and rolling stock entering and leaving the Facility track dirt, metals, and other pollutants off-site and onto Dolan Road where rainfall washes these pollutants into the storm drain system or directly into waters of the United States.

34.     The types of pollutants that the Facility releases into the immediate environment include, among others: dust, debris and toxic metals such as copper, lead, and zinc; petroleum products including oil, gasoline, grease, and diesel fuel; battery fluids, brake fluids, transmission fluids, acids and solvents; and total suspended solids ("TSS") and pH-affecting substances. The industrial materials stored, and the pollutants generated, at the Facilities are exposed to stormwater flows.

35.     Most of the area where automobiles and parts are stored, processed, and/or crushed at the Facility are unpaved. Thus, pollutants from Pick-n-Pull's activities can soak into unpaved ground and later become mobilized in stormwater flows.

**Pick-n-Pull Activities Contributing to CWA Violations**

36.     Pick-n-Pull has not developed and/or implemented an adequate SWPPP at the Facility.

37.     Pick-n-Pull has not implemented BMPs that adequately minimizes the exposure of pollutants at the Facility to stormwater.

38.     Pick-n-Pull has not implemented BMPs at the Facility that adequately control and minimize contaminated runoff from the facility.

39.     Pick-n-Pull has not implemented BMPs at the Facility that adequately treat and remove pollutants in stormwater prior to discharge.

40.     Pick-n-Pull has not adequately evaluated and revised its SWPPP for the Facility to

address these failures. Pick-n-Pull has also failed to fully implement its SWPPP and properly operate and maintain the structures and systems that have been put in place to achieve compliance with the Industrial Stormwater Permit and SWPPP requirements.

41.     Pick-n-Pull has not developed and/or implemented an adequate MRP at the Facility.

42.     Pick-n-Pull's monitoring and reporting activities have not resulted in practices that adequately reduce or prevent pollutants from discharging into stormwater flows from the Facility.

43.     Pick-n-Pull has failed to complete all of the visual observations and stormwater sampling required by the Industrial Stormwater Permit at the Facility.

44.     Pick-n-Pull's monitoring activities have not effectively identified compliance problems at the Facility or resulted in effective revision of each its SWPPP.

45.     Due to Pick-n-Pull's lack of effective pollution prevention measures, its failure to implement effective best management practices, and its failure to implement an effective monitoring and reporting program, stormwater from the Facility becomes polluted with many constituents. Dust, toxic metals such as copper, lead and zinc; petroleum products including fuels and oil, brake and transmission fluids, acids and solvents; and TSS and pH-affecting substances become entrained in stormwater when such water flows over and across the outdoor processing areas of the Facilities. This polluted stormwater is discharged to Elkhorn Slough, which then flows into Monterey Bay.

46.     Pick-n-Pull's own stormwater sampling indicates that Pick-n-Pull's discharges of stormwater from the Facility is consistently contaminated with higher levels of pollutants than is permissible under the Industrial Stormwater Permit.

VII.   **CLAIMS**

**FIRST CLAIM FOR RELIEF**

**Discharges of in Violation of Technology-Based Effluent Limitations
(Violations of 33 U.S.C. § 1311)**

47.     Plaintiffs incorporate the allegations contained in all preceding paragraphs as though fully set forth herein.

48.     The CWA provides that "the discharge of any pollutant by any person shall be unlawful" unless the discharger is in compliance with the terms of a NPDES permit. CWA § 301(a), 33 U.S.C. § 1311(a); *see also* CWA § 402(p), 33 U.S.C. § 1342(p) (requiring NPDES permit issuance for the discharge of stormwater associated with industrial activities). The Facility discharges stormwater associated with industrial activity to the Elkhorn Slough and Monterey Bay which is contaminated with pollutants. The Facility discharges stormwater pursuant to the Industrial Stormwater Permit, which authorizes these discharges conditioned on the Facility complying with the terms of the Industrial Stormwater Permit. Each of these permit terms constitutes an "effluent limitation" within the meaning of CWA section 505(f), 33 U.S.C. § 1365(f). The Facility's stormwater discharges have violated numerous of these permit terms, thereby violating CWA effluent limitations.

49.     The Effluent Limitations of the Industrial Stormwater Permit, ¶ B.3, prohibit the Facility from discharging pollutants above the level commensurate with the application of BAT and BCT. On every day the Facility has existed since at least August 2, 1993 (the Facility has existed since at least January 1, 2010), Pick-n-Pull has been discharging polluted stormwater from the Facility containing levels of pollutants above the level commensurate with the application of BAT and BCT in violation of the Effluent Limitations, ¶ B.3, of the Industrial Stormwater Permit during every significant rain event (defined by the United States Environmental Protection Agency as a rainfall event generating 0.1 inches or more of rain).

50.     EPA and the State Board have published Benchmark Values set at the maximum level of pollutant loading generally expected if an industrial facility is employing BAT and BCT (which are set forth in Exhibits 1 and 2). As reflected in Exhibits 1 and 2, the Facility has repeatedly discharged stormwater from each of the discharge locations identified in Defendant's 516 A SWPPP and 516 B SWPPP containing pollutant levels exceeding Benchmark Values, which establishes that the Facility has discharged pollutants above a level commensurate with application of BAT and BCT. Exhibits 1 and 2 compile some of the self-monitoring data reported by the Facility to the Regional Board reflecting the Facility's sampling of actual stormwater discharges, as well as samples taken by others from the Facility. The sample results reflected in Exhibits 1 and

2 are representative of the pollutant levels in the Facility's discharge of stormwater, including such discharges that Pick-n-Pull did not sample or analyze. Thus, every instance when the Facility has discharged stormwater, including instances when the Facility has discharged stormwater that it has not sampled, this stormwater discharge has contained levels of pollutants comparable to the levels set forth in Exhibits 1 and 2. Such polluted stormwater discharges from the Facility have occurred during every significant rain event that the Facility has existed since at least August 2, 1993.

51.     EcoRights representatives further observed discharges of stormwater from outfall 2 at the 516 B portion of the Facility on December 3, December 11 and December 15, 2014. On each day, EcoRights representatives observed very prominent oil sheens in the stormwater discharges from this outfall and detected very strong petroleum hydrocarbon odors in the wastewater. BAT and BCT levels of treatment at the Facility would necessarily be sufficient to prevent the discharge of wastewater containing oils sheens and strong petroleum hydrocarbon odors. Thus, the presence of such sheens and odors in the stormwater discharges further establishes that Pick-n-Pull has discharged and is continuing to discharge stormwater that is not treated to a level commensurate with application of BAT and BCT. EcoRights alleges that the stormwater discharges EcoRights observed on these two days are representative of the stormwater discharges generally and thus every day Pick-n-Pull has discharged stormwater (*i.e.*, during every significant rain event since at least August 2, 1993 that the Facility has been in existence), Pick-n-Pull has discharged stormwater with levels of pollutants exceeding that which would be present if Pick-N-Pull employed BAT and BCT treatment.

52.     EcoRights further alleges that on each day that Pick-n-Pull has discharged stormwater Pick-n-Pull has discharged stormwater that was not treated to a level commensurate with BAT or BCT in violation of the Effluent Limitations of the Industrial Stormwater Permit, ¶ B.3., because, as further alleged in the Third Claim, below, Pick-n-Pull has not developed and implemented a SWPPP that mandates BMPs that are commensurate with BAT and BCT for the Facility.

53.     Unlawful discharges of stormwater from the Facility with levels of pollutants exceeding BAT and BCT levels of control continue to occur presently and will occur in the future

1    during all significant rain events.

2         54.    Each discharge of stormwater from the Facility after the effective date of the

3    Industrial Stormwater Permit has constituted and will constitute a separate violation of the

4    Industrial Stormwater Permit's Effluent Limitations and the CWA. Every day since at least five

5    years and sixty days before the date Plaintiff filed this Complaint that Pick-n-Pull has discharged

6    or will discharge polluted stormwater from the Facility in violation of the Effluent Limitations of

7    the Industrial Stormwater Permit, ¶ B.3 is a separate and distinct violation of CWA section 301(a),

8    33 U.S.C. § 1311(a) which subjects Pick-n-Pull to an assessment of civil penalties pursuant to

9    CWA sections 309(d) and 505, 33 U.S.C. §§ 1319(d) and 1365.

10                          **SECOND CLAIM FOR RELIEF**

11      **Discharges of in Violation of Water Quality-Based Effluent Limitations**
                     **(Violations of 33 U.S.C. § 1311)**
12

13        55.    Plaintiffs incorporate the allegations contained in all preceding paragraphs as

14   though fully set forth herein.

15        56.    The Discharge Prohibitions of the Industrial Stormwater Permit, ¶ A.2, prohibit

16   stormwater discharges that cause or threaten to cause pollution, contamination, or nuisance. The

17   Discharge Prohibitions of the Industrial Stormwater Permit, ¶ A.2, prohibit stormwater discharges

18   to surface or groundwater that adversely impact human health or the environment. The Receiving

19   Water Limitations of the Industrial Stormwater Permit, ¶ C.2, prohibit stormwater discharges that

20   cause or contribute to an exceedance of applicable Water Quality Standards. Applicable Water

21   Quality Standards are set forth in the Basin Plan[1] and the California Toxics Rule[2] ("CTR").

22        57.    The Basin Plan, *inter alia*, establishes the following Water Quality Standards for

23   Elkhorn Slough:

24   _____

25   [1] The Basin Plan is published by EPA on the internet at:
     http://www.epa.gov/waterscience/standards/wqslibrary/ca/ca_9_san_francisco.pdf
26   The Basin Plan is also published by the Regional Board on the internet at:
     http://www.swrcb.ca.gov/rwqcb2/basinplan.htm
27

28   [2] The CTR is set forth at 40 C.F.R. § 131.38 and is explained in the Federal Register preamble
     accompanying the CTR promulgation set forth at 65 Fed. Reg. 31682

(a) Controllable water quality shall conform to the water quality objectives contained therein. Basin Plan at III-2.

(b) Dissolved oxygen levels shall be a minimum of 5.0 mg/L [5,000 ug/L]. *Id*. at III-4.

(c) Suspended sediment shall not be discharged at rates that cause nuisance or adversely affect beneficial uses. *Id*. at III-3.

(d) Waters shall not contain settleable material in concentrations that result in deposition of material that causes nuisance or adversely affects beneficial uses. *Id*.

(e) Waters shall be free of changes in turbidity that cause nuisance or adversely affect beneficial uses. *Id*.

(f) Waters shall not contain oils, greases, waxes, or other similar materials in concentrations that result in a visible film or coating on the surface of the water or on objects in the water, that cause nuisance, or that otherwise adversely affect beneficial uses. *Id*.

58.     The Basin Plan further establishes numeric water quality criteria for copper, lead, and zinc.

59.     Pick-N-Pull's discharges of stormwater from the Facility from each of the discharge locations ("outfalls") identified in Pick-n-Pull's 516 A SWPPP and 516 B SWPPP have caused or contributed to an exceedance of one or more of the above-listed Water Quality Standards. Exhibits 1 and 2 compiles some of the self-monitoring data reported by the Facility to the Regional Board reflecting the Facility's sampling of stormwater discharges. The sample results reflected in Exhibits 1 and 2 are representative of the pollutant levels in the Facility's discharge of stormwater, including such discharges that Pick-n-Pull did not sample or analyze. Thus, every instance when the Facility has discharged stormwater, including instances when the Facility has discharged stormwater that Pick-n-Pull has not sampled, this stormwater discharge has contained levels of pollutants comparable to the levels set forth in Exhibits 1 and 2. Exhibits 1 and 2 indicates that the Facility routinely discharges stormwater to Elkhorn Slough containing,

*inter alia*, the following pollutants: copper, lead, zinc, total suspended solids (TSS), specific

conductance (EC), oil and grease, BOD, and COD. The levels of these pollutants in the Facility's

stormwater discharges have caused pollution, contamination, or nuisance in violation of the

Discharge Prohibitions of the Industrial Stormwater Permit, ¶ A.2 and have adversely impacted

the environment in violation of the Receiving Water Limitations of the Industrial Stormwater

Permit, ¶ C.1. Moreover, the discharge of these pollutants has caused the Elkhorn Slough not to

attain or contributed to these waters not attaining one or more applicable Water Quality Standards

in violation of the Receiving Water Limitations of the Industrial Stormwater Permit, ¶ C.1.

60.     Specifically, the Facility's discharge of excessive TSS has caused or contributed

to Elkhorn Slough not meeting applicable Water Quality Standards in the Basin Plan for levels of

suspended sediment and turbidity. The Facility's discharge of stormwater containing suspended

and settleable toxic metals and other materials has contributed to the deposition and/or dispersal

of materials that interfere with beneficial uses of Elkhorn Slough and a detrimental increase in

concentrations of toxic substances found in bottom sediments or aquatic life due to

bioaccumulation. The Facility's discharge of copper, lead and zinc have caused the Elkhorn

Slough to exceed Water Quality Criteria established by the CTR and Basin Plan for these

pollutants. The Facility's discharge of stormwater with high BOD/COD has contributed further to

the failure of Elkhorn Slough to meet standards for dissolved oxygen. The Facility's discharge of

oil and grease has caused or contributed to the Elkhorn Slough not meeting applicable Water

Quality Standards in the Basin Plan for oil and grease.

61.     EcoRights alleges and puts Pick-n-Pull on notice that each day that Pick-n-Pull

discharged stormwater from the Facility, Pick-n-Pull's stormwater contained levels of pollutants

matching the levels set forth in Exhibits 1 and 2 and thus caused levels of pollutants to exceed

one or more of the applicable Water Quality Standards in the Elkhorn Slough. Every day that the

Facility has been in existence since the effective date of the above-referenced Water Quality

Standards, which date back at least to 1986 in most instances and to May 24, 2000 for the

California Toxics Rule's limit on copper, lead, and zinc, Pick-n-Pull has discharged stormwater

from the Facility during at least every significant local rain event over 0.1 inches that has caused

or contributed to Water Quality Standards not being met in the Elkhorn Slough.

62.     EcoRights representatives further observed discharges of stormwater from outfall 2 at the 516 B portion of the Facility on December 3 and December 11, 2014. On both days, EcoRights representatives observed very prominent oil sheens in Pick-n-Pull's stormwater discharges from this outfall and detected very strong petroleum hydrocarbon odors in the wastewater. EcoRights representatives further observed that Pick-n-Pull's stormwater discharges on both days were very murky and dark colored and thus visibly contained high levels of turbidity. On December 11, 2014, EcoRights representatives further observed that Pick-n-Pull's stormwater discharges were reaching Elkhorn Slough and were causing visible oil sheens and visibly elevated turbidity in Elkhorn Slough's receiving waters. Thus, Pick-n-Pull's stormwater discharges caused Elkhorn Slough waters to fail to meet the Basin Plan's narrative water quality standards mandating that "Waters shall not contain oils, greases, waxes, or other similar materials in concentrations that result in a visible film or coating on the surface of the water or on objects in the water, that cause nuisance, or that otherwise adversely affect beneficial uses" and "Waters shall be free of changes in turbidity that cause nuisance or adversely affect beneficial uses." Basin Plan III-3. EcoRights alleges that the stormwater discharges EcoRights observed on these two days are representative of Pick-n-Pull's stormwater discharges generally and thus every day Pick-n-Pull has discharged stormwater, Pick-n-Pull has discharge stormwater that causes the Elkhorn Slough to fail to meet these Basin Plan water quality standards.

63.     The Stormwater discharges referred to in the preceding paragraphs further violate the Discharge Prohibitions of the Industrial Stormwater Permit, ¶ A.2, in that these discharges cause or threaten to cause pollution, contamination, or nuisance and further adversely impact human health and environment by polluting Elkhorn Slough with toxic metals, wastewater low in dissolved oxygen and high in turbidity, and oil sheens.

64.     Pick-n-Pull's unlawful discharges from the Facility continue to occur presently and will occur in the future during all significant rain events. Each discharge of stormwater from the Facility after the effective date of the Industrial Stormwater Permit has constituted and will constitute a separate violation of the Discharge Prohibitions of the Industrial Stormwater Permit,

¶ A.2, and/or the Receiving Water Limitations of the Industrial Stormwater Permit, ¶ C.2, and the CWA. Every day since at least five years and sixty days before the date Plaintiff filed this Complaint that Pick-n-Pull has discharged or will discharge polluted stormwater from the Facility in violation of Discharge Prohibitions of the Industrial Stormwater Permit, ¶ A.2 and/or the Receiving Water Limitations of the Industrial Stormwater Permit, ¶ C.2 is a separate and distinct violation of CWA section 301(a), 33 U.S.C. § 1311(a) which subjects Pick-n-Pull to an assessment of civil penalties pursuant to CWA sections 309(d) and 505, 33 U.S.C. §§ 1319(d) and 1365.

## THIRD CLAIM FOR RELIEF

### Failure to Develop and Implement an Adequate Stormwater
### Pollution Prevention Plan
### (Violations of 33 U.S.C. § 1311)

65.     Plaintiffs incorporate the allegations contained in all preceding paragraphs as though fully set forth herein.

66.     Pick-n-Pull has failed to develop and implement an adequate SWPPP or implement all necessary revisions to the SWPPP for the Facility as required by ¶¶ A.1, A.2, and A.9 of the Industrial Stormwater Permit.

67.     Pick-n-Pull has failed to prepare, maintain, revise and implement Pick-n-Pull's SWPPP as required, as evidenced by stormwater discharges that exceed EPA and State benchmarks and contribute to violations of Water Quality Standards in receiving waters. Pick-n-Pull's SWPPP does not specify adequate BMPs designed to reduce pollutant discharge to BAT and BCT levels in accord with Section A: SWPPP Requirements, ¶ 8 of the Industrial Stormwater Permit as evidenced by the Facility's continued discharge of stormwater contaminated above pollutant levels attainable via application of BAT and BCT. For example, all of the following BMP measures (note, this is an illustrative, not exhaustive list) are technologically feasible, constitute BAT and BCT for the Facility, and would greatly decrease Pick-n-Pull's discharges of contaminated stormwater: (1) paving and berming the entire Facility and building sufficient stormwater storage and treatment capacity to ensure that all stormwater is treated to a level that would meet EPA Benchmarks and not cause or contribute to exceedances of water quality

standards in Elkhorn Slough, (2) regular sweeping of the Facility with a regenerative sweeper to prevent the buildup of metals and other pollutants, (3) semiannual power washing of the Facility to further prevent the buildup of metals and other pollutants (coupled with the collection and off-site disposal of power wash water), (4), constructing roof overhang structures or buildings and then conducting auto crushing and all motor vehicle fueling only under cover and away from exposure to rainwater, (5) until such overhang structures or buildings are completed, to halt the practice of fueling motor vehicles during rainstorm events, (6) to drain all automotive fluids out of stored vehicles, including transmission fluids and brake fluids, (7) not to drain automotive fluids out of stored vehicles during rain events, (8) not to allow customers to remove any automotive parts from stored vehicles during rain events and (9) to place oil absorbent materials underneath stored automobiles that are sufficiently sized and sufficiently absorbent to prevent oil staining of the ground surrounding stored automobiles. Pick-n-Pull's SWPPPs failed to specify such BMPs.

68.     With respect to the last of the nine BMP items referred to in the preceding paragraph, Pick-n-Pull's SWPPPs provide for the placement of carpeted floor mats or other small pieces of carpet underneath the front portion of most vehicles or the rear portion of rearwheel drive vehicles and trucks to collect residual oils leaking from vehicles. SWPPP 516 A, §§ 4.1.6., 4.2, 4.3.3, Appendix 2; SWPPP 516 B § 4.1.6, 4.2, 4.3.3, Appendix 2. This BMP is plainly inadequate. EcoRights representatives visited the Facility on September 19, 2015 and observed extensive oil staining throughout the Facility. EcoRights representatives observed that oil dripping from vehicles in numerous locations saturated the small carpeted mats placed underneath vehicles and that oil than further leaked beyond these mats onto the soil surrounding the mats. EcoRights representatives further observed numerous oil stains on the ground in various other locations, including the areas Pick-n-Pull uses as roadway or driveway for the movement of vehicles, personnel, and customers. It was plainly obvious that the extensive oil staining on the Facility could only have occurred from long-term and systematic failure to capture and clean-up oil leaks from vehicles.

69.     Furthermore, Pick-n-Pull's November 25, 2014 cover letter to the Regional

Board accompanying Pick-n-Pull's transmittal of the 516 B SWPPP expressly admitted and represented that sand filters equivalent to the StormwateRx Aquip-Retenu Filtration System are BAT for Pick-n-Pull's industry. Yet, Pick-n-Pull's current 516 A SWPPP and 516 B SWPPP only provide for a sand filter to treat discharges from one of Pick-n-Pull's four stormwater outfalls-- outfall 2 located on the 516 B Dolan Road site. Pick-n-Pull's SWPPP is thus inadequate in failing to provide for sand filter treatment at all four of Pick-n-Pull's stormwater outfalls when Pick-n-Pull has expressly conceded that sand filter treatment is BAT for Pick-n-Pull's industry. Additionally, Pick-n-Pull's SWPPP is inadequate in providing for a filtration system that only has the capacity to treat 160 gallons per minute. This is an undersized filter for the area being treated. Storm events with an expected return frequency of only one year generate stormwater runoff at a rate that exceeds this 160 gallons per minute rate many times over. Thus, even in relatively routine storms, Pick-n-Pull's sand filter system will be rapidly overwhelmed by incoming stormwater flow, and Pick-n-Pull will discharge stormwater that does not receive treatment from Pick-n-Pull's sand filter. Finally, while filtration of stormwater prior to discharge from an auto dismantling facility constitutes a component of BAT and BCT, filtration of stormwater with a sand filter unit comparable to the one Pick-n-Pull has employed is not and would not be sufficient to meet BAT and BCT treatment requirements. A sand filter is not the best available technology or best conventional technology for the Facility. More sophisticated and effective filter systems constitute BAT and BCT for the Facility, and Pick-n-Pull will only comply with requirements to employ BAT and BCT by revising Pick-n-Pull's SWPPPs to specify such more effective filter systems.

70.     In Pick-n-Pull's 2013-2014 Annual Reports, Pick-n-Pull expressly indicated that an appropriate revised BMP measure necessary for the Facility was the installation of new sand filters at both stormwater discharge points located on the 516 A Dolan Road site and an additional discharge point located on 516 B Dolan Road (outfall 1) to further reduce TSS concentrations. However, Pick-n-Pull has yet to revise Pick-n-Pull's SWPPP to specify installation of a sand filter at 516 A Dolan Road. At 516 B Dolan Road, Pick-n-Pull has yet to revise Pick-n-Pull's SWPPP to specify installation of a sand filter on outfall 1 and an adequately designed and maintained sand

filter for outfall 2 (as evidenced, for example, by the very high levels of pollutants in a stormwater discharge that EcoRights sampled from the Facility on December 3 and December 11, 2014). Pick-n-Pull's SWPPP is not adequate due to its failure to include a properly updated specification of such BMPs. Furthermore, Pick-n-Pull's failure to revise Pick-n-Pull's SWPPPs to provide for the sand filters and then implement such revised SWPPPs within 90 days of Pick-n-Pull's finding that additional sand filters are necessary constitutes a violation of Section A, ¶ 10.d. of the Industrial Stormwater Permit. This latter section of the Industrial Stormwater Permit requires SWPPPs to "be revised and implemented in a timely manner, but in no case more than 90 days after facility operator determines that the SWPPP is in violation of any requirement(s) of this General Permit." Pick-n-Pull's finding that additional sand filters are required at the Facility is the equivalent of finding that current BMPs at the Facility do not meet the Permit's requirement to have BMPs that achieve BAT or BCT levels of treatment.

71.     Pick-n-Pull has further failed to implement Pick-n-Pull's SWPPPs' provision for promptly cleaning up spilled oil. SWPPP 516 A, § 4.1.6.; SWPPP 516 B § 4.1.6. As noted, EcoRights representatives visited the Facility on September 19, 2015 and observed extensive oil staining throughout the Facility. EcoRights representatives observed that oil dripping from vehicles in numerous locations saturated the small carpeted mats placed underneath vehicles and that oil than further leaked beyond these mats onto the soil surrounding the mats. Ecorights representatives further observed numerous oil stains on the ground in various other locations, including the areas Pick-n-Pull use as roadway or driveway for the movement of vehicles, personnel, and customers. EcoRights representatives observed these oil stains on the ground in areas that are plainly and easily accessible and could have easily been cleaned up. It was plainly obvious that the extensive oil staining on the Facility could only have occurred from long-term and systematic failure to capture and clean-up oil leaks from vehicles, even in areas where cleanup would be easily accomplished.

72.     Pick-n-Pull has failed to comply with requirements that Pick-n-Pull's SWPPPs include a complete list of significant materials handled and stored at the site and assessment of "which pollutants are likely to be present in stormwater discharges" from the site. Industrial

Stormwater Permit; Section A, ¶ 5 and Section A, ¶ 7.a.ii. Pick-n-Pull's SWPPP fails to identify the following pollutants obviously present at a facility engaged in auto dismantling and auto crushing: ethylene glycol, biochemical oxygen demand, chemical oxygen demand, acids, halogenated organic compounds present in solvents, and detergents.

73.     Pick-n-Pull's site map in Pick-n-Pull's SWPPP is inadequate because it does not comply with the specifications in the California Auto Dismantling Group Participants Group Stormwater Management Program Manual and Stormwater Pollution Prevention Plan ("GSMP") to include sufficiently detailed specification of the size in square feet or acreage of the buildings, operation areas, and storage areas comprising the Facility. This constitutes a violation of Industrial Stormwater Permit; Section A, ¶ 4 and Section B, ¶ 15.

74.     Pick-n-Pull's failures to draft an adequate SWPPP, and/or to revise, and/or to implement Pick-n-Pull's SWPPP in all the above respects are in violation of the requirements of Section A of the Industrial Stormwater Permit. Pick-n-Pull was required to have prepared and implemented an adequate SWPPP by no later than October 1, 1992 pursuant to the previous Industrial Stormwater Permit issued by the State Board and by Section A: Stormwater Pollution Prevention Plan Requirements, ¶ 1 of the current Industrial Stormwater Permit. Therefore, Pick-n-Pull has been in daily and continuous violation of the Industrial Stormwater Permit's requirement to develop and implement an adequate SWPPP for the Facility on each and every day since October 1, 1992 that Pick-n-Pull has maintained the Facility. Pick-n-Pull will continue to be in violation every day that Pick-n-Pull fail to develop and implement an adequate SWPPP.

75.     Every day since at least five years and sixty days before the date Plaintiff filed this Complaint that Pick-n-Pull has failed to draft an adequate SWPPP, and/or to revise, and/or to implement Pick-n-Pull's SWPPP in violation of the requirements of Section A of the Industrial Stormwater Permit is a separate and distinct violation of CWA section 301(a), 33 U.S.C. § 1311(a) which subjects Pick-n-Pull to an assessment of civil penalties pursuant to CWA sections 309(d) and 505, 33 U.S.C. §§ 1319(d) and 1365.

## FOURTH CLAIM FOR RELIEF

### Failure to Develop and Implement an Adequate

**Monitoring and Reporting Program**
**(Violations of 33 U.S.C. § 1311)**

76.     Plaintiffs incorporate the allegations contained in all preceding paragraphs as though fully set forth herein.

77.     Pick-n-Pull has failed to develop and implement an adequate monitoring and reporting program ("MRP") and implement all necessary revisions to the MRP at the Facility as required by Section B and Provision ¶ E.3 of the Industrial Stormwater Permit.

78.     Pick-n-Pull is a member of the California Auto Dismantling Monitoring Group and as such are subject to the Stormwater Industrial Permit's group monitoring requirements set forth in Section B: MRP Requirements, ¶ 15. While this section of the Stormwater Industrial Permit authorizes Pick-n-Pull to reduce Pick-n-Pull's stormwater sampling frequency from two storm events per year that would otherwise be mandated by Section B: MRP Requirements, ¶ 5 to no less than two storm events per five year period (as directed by the group leader of the California Auto Dismantling Monitoring Group ("Group Leader")), Pick-n-Pull is still required to comply with the Industrial Stormwater Permit's requirements concerning the timing of Pick-n-Pull's sampling events and the outfalls Pick-n-Pull must sample. Pick-n-Pull is further still required to comply with the provisions in Pick-n-Pull's SWPPP concerning the outfalls Pick-n-Pull must sample and the pollutants Pick-n-Pull must analyze. *See* Industrial Stormwater Permit, Section B, ¶ 1.

79.     Pick-n-Pull's MRP must provide for collection of stormwater samples from the first hour of discharge from the first storm event of the wet season and analysis of such samples. Section B: MRP Requirements ¶ 5. Pick-n-Pull's MRP must further direct Pick-n-Pull to take and analyze samples from each discharge point at the Facility. *Id*. at ¶¶ 5, 7.a. Pick-n-Pull's MRPs do mandate that Pick-n-Pull take and separately analyze samples from each discharge point at the Facility during the stormwater discharge events that Pick-n-Pull monitors. SWPPP 516 A ¶ 5.4; SWPPP 516 B ¶ 5.4. Pick-n-Pull's Annual Reports submitted to the Regional Board for the Facility indicate that Pick-n-Pull has not consistently and/or properly taken and analyzed the required samples. For 516 A Dolan Road, Pick-n-Pull only analyzed a composite sample for the single stormwater discharge Pick-n-Pull sampled in water year 2011/12. Analysis of a composite

sample does not comply with the Permit requirements as it does not represent sampling from all representative discharge points that represent the "quality and quantity of the facility's stormwater discharges." *Id*. at ¶ 7.a.; *see also id*. ¶ 7.d. (authorizing compositing samples from multiple discharge locations only upon annual report documentation that the samples are from a "substantially identical drainage area." Notably, Pick-n-Pull's SWPPPs indicate that the areas draining to Pick-n-Pull's outfalls are not substantially identical. SWPPP 516 A ¶ 5.4; SWPPP 516 B ¶ 5.4). In water year 2012/13, Pick-n-Pull did not collect or analyze a single stormwater sample at all. This is a violation of the Permit to the extent that the Group Leader directed Pick-n-Pull to take a stormwater sample in that water year. Section B: MRP Requirements ¶ 15.

80.     For 516 B Dolan Road, in water years 2009/10 and 2010/11, Pick-n-Pull either analyzed only a composite sample or a sample from only 1 of 2 discharge points. In either case, this would be a violation of the MRP requirements. *Id*. at ¶¶ 5, 7. For water year 2011/2012, Pick-n-Pull analyzed only a composite sample, in violation of the Permit's requirements. In water year 2013/14, Pick-n-Pull analyzed samples from each of Pick-n-Pull's two discharge points, but Pick-n-Pull took these samples on different days. The Permit and Pick-n-Pull's MRP require Pick-n-Pull to take Pick-n-Pull's samples from all discharge locations during the same first storm event of the wet season (and to sample all discharge locations during each qualifying storm event that Pick-n-Pull takes samples during). *See id*., Section B ¶ 5; 516 B SWPPP ¶ 5.4. Thus, Pick-n-Pull violated the Permit's Section B: MRP Requirements ¶¶ 5, 7 by not collecting and analyzing stormwater samples as required by the Industrial Stormwater Permit and Pick-n-Pull's MRPs. For water years 2008/09 and 2012/13, Pick-n-Pull did not analyze any samples at all. This is a violation of the Permit to the extent that the Group Leader directed Pick-n-Pull to take a stormwater sample in those water years. Section B: MRP Requirements ¶ 15.

81.     Pick-n-Pull's MRP must provide for visual monitoring and recording of stormwater discharge from one rainfall event per month during the October 1 to May 30 wet season. Section B: MRP Requirements, ¶¶ 3, 4 and 7 (visual observation of stored or contained stormwater must be made during release). Pick-n-Pull's Annual Reports submitted to the Regional Board for the Facility indicate that in all years from at least 2011 to the present, Pick-n-Pull has

not made and recorded at least one visual observation of all points of discharge of stormwater from the Facility during at least one rainfall event per month from October 1 to May 30. There were several months in this time period during which Pick-n-Pull had stormwater discharges from self-reported and unreported discharge points but failed to monitor stormwater discharges and record the results of this monitoring. Specifically, Pick-n-Pull failed to make the required visual observations of storms in the following months; 2012-March; 2013-March, April, October.

82.     Pick-n-Pull has repeatedly failed to include all discharge points in Pick-n-Pull's wet season monthly monitoring. Pick-n-Pull has reported two discharge points at each part of the facility located at 516 A Dolan Road and 516 B Dolan Road, for a total of four discharge points. Pick-n-Pull also failed to conduct monthly visual observations or record discharges at each discharge point, including but not limited to the two reported discharge points at each part of the Facility. Pick-n-Pull failed to report accurately on the presence of qualifying storms and the presence of discharge during the wet season in several years. Specifically, Pick-n-Pull failed to make the required visual observations of stormwater discharges during storms in the following months: 2011-October, November; 2012-January, March, April, October, November, December; 2013-March, April, October, November; 2014-March, April. Pick-n-Pull's Annual Reports simply skip some of these months altogether or otherwise fail to report visual observations of stormwater discharge on all days where NOAA climate data for the Watsonville Airport station reports that there was rain over 0.1 inches. Thus, there necessarily had to have been discharge from the Facility that Pick-n-Pull failed to observe and report. Accordingly, Pick-n-Pull has violated the visual monitoring requirements of Section B: MRP Requirements, ¶ 3 and the Annual Report requirements of Section B: MRP Requirements, ¶ 14 and Section C: Standard Provisions, ¶¶ 9 and 10.

83.     It is a further violation of Pick-n-Pull's SWPPP that Pick-n-Pull failed to monitor and report on stormwater discharges during rain events. Section 5.1.4 of both the 516 A and 516 B SWPPP provides for "Daily Rain Checks" wherein Pick-n-Pull "shall document any rain events that occur during working hours and within the first hour that discharge from the facility occurs." As noted, any failure to comply with Pick-n-Pull's SWPPP also constitutes a violation of Section

A, ¶ 1 of the Industrial Stormwater Permit. These visual monitoring failures further constitute failure to comply with the GSMP, which imposes the same monitoring requirements. This constitutes a violation of the Permit, Section B: MRP, ¶ 15.

84.     Pick-n-Pull's MRP must provide for analysis of stormwater samples for TSS, pH, specific conductance, and total organic carbon ("TOC") or oil and grease. In addition, Pick-n-Pull's MRP must provide for analysis of stormwater samples for the other analytical parameters listed in the Industrial Stormwater Permit under Table D. Pick-n-Pull has indicated to the Regional Board that Pick-n-Pull's SIC code is 5015, which would obligate Pick-n-Pull under Table D to analyze stormwater samples for iron, lead, and aluminum. However, given that Pick-n-Pull acknowledges that it performs auto crushing and engages in the sale of crushed autos as scrap metal, Pick-n-Pull also should be assigned SIC Code 5093, the SIC Code assigned to auto wreckers engaged in dismantling automobiles for scrap. Table D thus further requires Pick-n-Pull to analyze Pick-n-Pull's samples for copper, zinc and chemical oxygen demand (COD). Pick-n-Pull must in any case analyze Pick-n-Pull's samples at least for all of the polluting parameters identified in Pick-n-Pull's SWPPP/MRP. Industrial Stormwater Permit, Section B: MRP, ¶ 1. Pick-n-Pull's SWPPP/MRP identifies the following pollutants as those Pick-n-Pull will analyze the Facility's stormwater discharges for: specific conductivity (EC), pH Level, oil and grease, TSS, total aluminum, total copper, total iron, total lead, and total zinc. SWPPP 516 B, ¶ 5.2. The GSMP (¶ 2.3, Appendix 3) further specifies that Pick-n-Pull and all monitoring group members must analyze Pick-n-Pull's stormwater discharges for: pH, TSS, specific conductance, TOC, COD, oil and grease, total lead, total zinc, total aluminum, total iron, total copper, and total nickel. Finally, Pick-n-Pull's MRP must provide for analysis of toxic chemicals and other pollutants that are likely to be present in Pick-n-Pull's stormwater discharges. Industrial Stormwater Permit, Section B: MRP Requirements, ¶ 5. Sampling conducted by Pick-n-Pull and by EcoRights has shown that Pick-n-Pull's stormwater discharges contain elevated copper, zinc, biochemical oxygen demand (BOD), and COD. In addition, any party operating in Pick-n-Pull's industry doing their due diligence would know that stormwater from a Facility such as Pick-n-Pull's would have, *inter alia*, high BOD and COD. Pick-n-Pull's MRP is inadequate because it

1  fails to provide for analysis of BOD, COD, TOC and nickel.

2  85.  Pick-n-Pull has failed to implement Pick-n-Pull's MRP and/or an MRP that

3  would be compliant with the Stormwater Industrial Permit because Pick-n-Pull has not analyzed

4  all of the pollutant parameters listed in the preceding paragraph in each of the stormwater runoff

5  events from the Facility that Pick-n-Pull was required to take samples of. Specifically, Pick-n-Pull

6  failed to analyze Pick-n-Pull's stormwater discharges from the outfalls on both the 516 B and 516

7  A Dolan sites for iron, aluminum, nickel, TOC, BOD, and COD in the stormwater sample Pick-n-

8  Pull took in water year 2010/2011; for iron, aluminum, nickel, TOC, BOD, or COD in the

9  stormwater sample Pick-n-Pull took in water year 2010/2011; for iron, aluminum, nickel, TOC,

10  BOD, and COD in the stormwater sample Pick-n-Pull took in water year 2011/2012; and for

11  BOD, COD and pH in the stormwater sample Pick-n-Pull took in water year 2013/14.

12  86.  Unauthorized non-stormwater discharges are prohibited by the Industrial Permit.

13  Section A ¶ 1. Pick-n-Pull is required to report and monitor all unauthorized non-stormwater

14  discharges. Section B ¶ 3. In Pick-n-Pull's Annual Reports for 516 A Dolan Road, in 2013/14,

15  Pick-n-Pull self-reported that after quarterly observation, Pick-n-Pull observed unauthorized non-

16  stormwater discharges, and referred to Exhibit 2 as a summary of these non-stormwater

17  discharges. However, in violation of the requirements of the Permit, Section B, this chart does not

18  indicate the source of these discharges or any corrective action to address these discharges. In

19  2012/13, Pick-n-Pull did not answer either way whether there were observed non-stormwater

20  discharges at either the 516 A or 516 B Dolan sites, but attached the same format for the chart

21  tracking the non-stormwater discharges that similarly fail to properly indicate the source of the

22  discharges or any corrective actions.

23  87.  As alleged in the preceding paragraphs, Pick-n-Pull has not developed and

24  implemented an adequate MRP. Pick-n-Pull was required to have prepared and implemented an

25  adequate MRP by no later than October 1, 1992 pursuant to the previous Industrial Stormwater

26  Permit issued by the State Board and by Section B: Monitoring Program and Reporting

27  Requirements, ¶ 1.a. of the current Industrial Stormwater Permit. Therefore, Pick-n-Pull has been

28  in daily and continuous violation of the monitoring and reporting requirements of the Industrial

Stormwater Permit set forth in Section B: MRP Requirements every day since October 1, 1992. Pick-n-Pull will continue to be in violation every day that Pick-n-Pull fails to develop and implement an adequate MRP for the Facility.

88.     As further discussed above, Pick-n-Pull has not submitted accurate and complete Annual Reports and reports of Pick-n-Pull's noncompliance with the Industrial Stormwater Permit. Therefore, Pick-n-Pull has been in daily and continuous violation of the reporting requirements of the Industrial Stormwater Permit, Section B: MRP Requirements, ¶ 14 and Section C: Standard Provisions, ¶¶ 9 and 10 every day since each of Pick-n-Pull's Annual Reports were due.

89.     Every day since at least five years and sixty days before the date Plaintiff filed this Complaint that Pick-n-Pull has failed to prepare and implement an adequate MRP as required by Section B: Monitoring Program and Reporting Requirements or comply with the reporting requirements of the Industrial Stormwater Permit, Section B: MRP Requirements, ¶ 14 and Section C: Standard Provisions, ¶¶ 9 and 10 is a separate and distinct violation of CWA section 301(a), 33 U.S.C. § 1311(a) which subjects Pick-n-Pull to an assessment of civil penalties pursuant to CWA sections 309(d) and 505, 33 U.S.C. §§ 1319(d) and 1365.

90.     An action for injunctive relief is authorized by CWA section 505(a), 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged in Plaintiff's First through Fourth Claims above will irreparably harm Plaintiff and Plaintiff's members, for which harm they have no plain, speedy, or adequate remedy at law.

Wherefore, Plaintiff prays judgment against Pick-n-Pull as set forth hereafter.

## VIII.     RELIEF REQUESTED

91.     Wherefore, EcoRights respectfully requests this Court to grant the following relief:

a.     Declare Defendants to have violated and to be in violation of CWA section 301(a), 33 U.S.C. § 1311(a), for discharging pollutants from its the Facility in violation of a permit issued pursuant to CWA section 402, 33 U.S.C. § 1342 and for failing to comply with all substantive and procedural requirements of the Industrial Stormwater Permit and the CWA;

1       b.       Enjoin Defendants from discharging pollutants from its Facility to Elkhorn

2  Slough and Monterey Bay;

3       c.       Enjoin Defendants to restore all receiving waters damaged by Defendant's illegal

4  discharges of pollutants from the Facility;

5       d.       Enjoin Defendants from violating the substantive and procedural requirements of

6  the Industrial Stormwater Permit at the Facility;

7       e.       Order Defendants to pay civil penalties of up $37,500 per day in accord with

8  CWA Section 309(d), 33 U.S.C. § 1319(d) and 40 C.F.R. §§ 19.1 - 19.4 (2009).

9       f.       Award Plaintiff its costs (including reasonable attorney, witness, and consultant

10  fees) as authorized by the CWA, 33 U.S.C. § 1365(d); and

11       g.       Award such other relief as this Court may deem appropriate.

12  **IX.**       **DEMAND FOR JURY**

13        Pursuant to Federal Rule of Civil Procedure 38(b), EcoRights demands a jury trial in

14  this matter.

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1  **X.       DISCLOSURE OF NON-PARTY INTERESTED ENTITIES OR PERSONS**

2         Based on EcoRights' knowledge to date, pursuant to Civil Local Rule 3-16, the

3  undersigned certifies that, as of this date, other than the named parties, there is no such interest to

4  report.

5

6  Dated: May 25, 2015                              ENVIRONMENTAL ADVOCATES

7

8  _____

9  Christopher Sproul, Attorney for Plaintiff
   ECOLOGICAL RIGHTS FOUNDATION

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28