Christopher Sproul (State Bar No. 126398)
Jodene Isaacs (State Bar No. 226895)
ENVIRONMENTAL ADVOCATES
5135 Anza Street
San Francisco, California 94121
Telephone: (415) 533-3376, (510) 847-3467
Facsimile: (415) 358-5695
Email:  csproul@enviroadvocates.com
Email:  jisaacs@enviroadvocates.com

Fredric Evenson (State Bar No. 198059)
ECOLOGY LAW CENTER
~Monterey Bay~
P.O. Box 1000
Santa Cruz, CA 95061
Telephone: (831) 454-8216
Email: evenson@ecologylaw.com

Attorneys for Plaintiff
ECOLOGICAL RIGHTS FOUNDATION

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ECOLOGICAL RIGHTS FOUNDATION,<br><br>        Plaintiff,<br>       v.<br><br>PICK-N-PULL SAN JOSE AUTO DISMANTLERS, A CALIFORNIA GENERAL PARTNERSHIP,<br><br>        Defendant. | Civil Case No. 5:15-cv-02381 PSG<br><br><br>CONSENT DECREE |

WHEREAS, Plaintiff Ecological Rights Foundation ("ERF") is a non-profit public benefit corporation dedicated to the preservation, protection, and restoration of the environment, the wildlife and the natural resources of all waters of California, including Elkhorn Slough and Monterey Bay;

WHEREAS, Plaintiff alleges that Defendants Pick-n-Pull Auto and Truck Dismantlers and Schnitzer Steel Industries, Inc. either are owner and/or operators of the automobile dismantling and used auto parts facilities located at 516A & 516B Dolan Road, Moss Landing, California (hereinafter "the Facilities") or have caused pollutants to be discharged to waters of the United States from the Facilities;

WHEREAS, Defendants aver that Pick-n-Pull San Jose Auto Dismantlers, a California general partnership (hereinafter "Pick-n-Pull" or "PNP") is the owner and operator of the Facilities, and is solely responsible for compliance with the requirements of the Clean Water Act;

WHEREAS, Pick-n-Pull Auto Dismantlers, a California general partnership, and Klauers, Inc., a California corporation, are the general partners of Pick-n-Pull San Jose Auto Dismantlers;

WHEREAS, Pick-n-Pull's operations involve the de-pollution and recycling of end-of-life vehicles, thus contributing to protection of the environment and conservation of natural resources;

WHEREAS, storm water flows off-site from the Facilities at four different discharge points or outfalls; each outfall discharges onto the ground near the edge of Elkhorn Slough and has the potential to runoff into the Slough;

WHEREAS, discharges from the Facilities are regulated by the National Pollutant Discharge Elimination System ("NPDES") General Permit NO. CAS000001 [State Water Resources Control Board] ("Storm Water Permit")[1] and the Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 *et seq.* ("Clean Water Act" or "CWA"). Pick-n-Pull is a participant in the California Auto Dismantlers Compliance Group under the Storm Water Permit;

WHEREAS, on March 21, 2015, ERF provided notice of violations of the CWA by Pick-n-Pull and Schnitzer Steel Industries, Inc. and of ERF's intention to file suit against these entities.

---

[1] The Storm Water Permit was adopted by the State Board through Order No. 2014-0057-DWQ which went into effect July 1, 2015. Industrial storm water discharges that occurred prior to that date were subject to Order No. 97-03-DWQ.

Notice was provided to the Administrator of the United States Environmental Protection Agency ("EPA"); the Regional Administrator of EPA Region IX; the Executive Director of the California State Water Resources Control Board ("State Board"); the Executive Officer of the California Regional Water Quality Control Board, Region 3 ("Regional Board"); the U.S. Attorney General, and the Defendants ("Notice Letter") as required by the CWA, 33 U.S.C. § 1365(b)(1)(A);

**WHEREAS**, on May 4, 2015, Pick-n-Pull submitted a detailed response to the Notice Letter to Plaintiff, setting forth defenses to many of the alleged violations and describing the steps it had undertaken to correct other alleged violations. Among other things, PNP's response described the structural and non-structural Best Management Practices ("BMPs") employed by the Facilities as part of its Storm Water Pollution Prevention Plan ("SWPPP") to reduce or prevent pollutants in storm water discharges;

**WHEREAS**, on May 28, 2015, Plaintiff filed a complaint against Pick-n-Pull Auto and Truck Dismantlers and Schnitzer Steel Industries, Inc., in the United States District Court, Northern District of California (Case No. 15-02381 PSG) alleging ongoing violations of the CWA (hereinafter "Complaint");

**WHEREAS**, Schnitzer Steel Industries, Inc. specifically denies it is the owner or operator of the Facilities or that it is responsible for compliance with the Storm Water Permit or the CWA at the Facilities;

**WHEREAS**, Pick-n-Pull and Schnitzer Steel Industries, Inc. deny all allegations in the Notice Letter and Complaint, and maintain that the operations at the Facilities are in compliance with the requirements of the CWA and the Storm Water Permit;

**WHEREAS**, this Consent Decree shall be submitted to the EPA and United States Department of Justice ("DOJ") for the statutory review period pursuant to 33 U.S.C. §1365(c) and 40 C.F.R. § 135.5;

**WHEREAS**, Plaintiff and Pick-n-Pull agree that it is in the Parties' mutual interest to enter into a Consent Decree setting forth terms and conditions appropriate to resolving the allegations set forth in the Complaint without further proceedings and without any admission of liability on the part of the Defendants;

**WHEREAS**, Plaintiff agrees that Schnitzer Steel Industries, Inc. is not a party to this Consent Decree and will be dismissed from the complaint; and

**WHEREAS**, all actions taken by Pick-n-Pull pursuant to this Consent Decree shall be made in compliance with all applicable Federal and State laws and local rules and regulations.

**NOW THEREFORE IT IS HEREBY STIPULATED BETWEEN THE PARTIES AND ORDERED AND DECREED BY THE COURT AS FOLLOWS:**

**I.  GENERAL OBJECTIVES**

1.  The objectives of this Consent Decree are:

   a.  To ensure that Pick-n-Pull continues to improve storm water quality as necessary to comply with the Storm Water Permit;

   b.  To ensure that Pick-n-Pull continues to use, implement, and improve ways, means, and methods to prevent or reduce the discharge of pollutants in storm water runoff from the Facilities; and

   c.  To further the goals and objectives of the CWA.

2.  Unless otherwise expressly defined herein, terms used in this Consent Decree which are defined in the CWA or in regulations or rules promulgated under the CWA have the meaning assigned to them in the statutes or regulations or rules. Whenever terms listed below are used in this Consent Decree, the following definitions apply:

"Consent Decree" means this Consent Decree and any attachments or documents incorporated by reference.

"Day" means a calendar day. In computing any period of time under this Consent Decree, where the last day of such period is a Saturday, Sunday, or Federal or State Holiday, the period runs until the close of business on the next day that is not a Saturday, Sunday, or Federal or State Holiday.

"Design Storm" means the volume of runoff produced from an 85th percentile 24-hour storm event, as determined from the National Oceanic and Atmospheric Administration's Castroville rainfall records from 1995 to through 2015.

"Dry Season" means the five-month period beginning May 1st of any given year and ending September 30th of the same year.

"Effective Date" means the effective date of this Consent Decree, which shall be the last day for EPA and DOJ to comment on the Consent Decree, i.e., the 45th day following these agencies' receipt of the Consent Decree, or the date on which these agencies provide notice that they require no further review, whichever occurs earlier.

"Wet Season" means the seven-month period beginning October 1st of any given year and ending April 30th of the following year.

**II. JURISDICTION AND VENUE**

3.   This Court has jurisdiction over the subject matter of the claims asserted by Plaintiff pursuant to CWA section 505(a), 33 U.S.C. § 1365(a), 28 U.S.C. §§ 1331, 1355, and 1367. Venue is proper in this judicial district pursuant to section CWA §§ 309(b), 505(c), 33 U.S.C. §§ 1319(b), 1365(c), and 28 U.S.C. §§ 1391(b) and (c). The parties waive any and all objections that they may have to the Court's jurisdiction to enter and enforce this Consent Decree.

4.   The Complaint states claims upon which relief may be granted pursuant to Section 505 of the Clean Water Act, 33 U.S.C. § 1365.

5.   Plaintiff has standing to bring this action.

**III. EFFECT OF CONSENT DECREE/RELEASE OF CLAIMS**

6.   Plaintiff does not, by its consent to this Consent Decree, warrant or aver in any manner that Pick-n-Pull's compliance with this Consent Decree will constitute or result in compliance with any federal or state law or regulation.

7.   This Consent Decree is neither a permit nor a modification of existing permits under any federal, state, or local law and in no way relieves Pick-n-Pull of its responsibilities to comply with all applicable federal, state and local laws and regulations.

8.   Compliance with this Consent Decree, including all monetary payments due under this Consent Decree (including but not limited to the payment of any stipulated payments) and the completion of all storm water quality improvement measures required pursuant to this Consent Decree resolves Plaintiff's civil claims for the violations alleged against Pick-n-Pull in this Action.

9.   Plaintiff's Release: Upon the Effective Date of this Consent Decree, Plaintiff hereby releases Pick-n-Pull and its partners and its and their officers, directors, employees, successors and assigns,

from all CWA violations alleged in the Complaint up to and including the Effective Date of this Consent Decree. Except for claims for Pick-n-Pull's failure to comply with this Consent Decree, Plaintiff further releases Pick-n-Pull and its partners and its and their officers, directors, employees, successors and assigns, from all claims pertaining to alleged violations of the CWA that may occur due to discharges of storm water from the Facilities between the Effective Date and the termination of this Consent Decree.

10. Defendants' Release: Upon the Effective Date of this Consent Decree, Pick-n-Pull and its general partners  hereby release Plaintiff and its officers, directors, employees, members, attorneys, and each of their successors and assigns, from, and waives all claims which arise from or pertain to this action, including all claims for fees (including fees of attorneys, experts, and others), costs, expenses or any other sum incurred or claimed or which could have been claimed for matters associated with or related to Plaintiff's Notice Letter and Complaint up to the Effective Date.

## IV.  APPLICABILITY

11. The provisions of this Consent Decree apply to and bind Plaintiff and Pick-n-Pull (collectively, "Parties"), including any successors or assigns. The Parties certify that their undersigned representatives are fully authorized to enter into this Consent Decree, to execute it on behalf of the Parties, and to legally bind the Parties to its terms.

12. The Parties agree to be bound by this Consent Decree and not to contest its validity in any subsequent proceeding to implement or enforce its terms. By entering into this Consent Decree, Pick-n-Pull does not admit liability for any purpose as to any allegation or matter arising out of the Action. Nothing in this Consent Decree shall constitute an admission of any fact or a waiver of any right or defense unless specifically set forth herein.

13. No change in ownership or corporate or other legal status of Pick-n-Pull or any transfer of Pick-n-Pull's assets or liabilities shall in any way alter the responsibilities of Pick-n-Pull or any of its successors or assigns thereof, under this Consent Decree. In any action to enforce this Consent Decree, Pick-n-Pull shall not raise as a defense the failure by any of its agents, servants, contractors, employees, successors or assigns to take actions necessary to comply with this Consent Decree, unless such actions were prevented by a force majeure.

14. Except as otherwise provided in this Part, the sale or transfer of ownership or operation of any portion of either Facility does not relieve Pick-n-Pull of its obligations under this Consent Decree. Not later than thirty (30) days prior to sale or transfer of ownership or operation of any portion of either Facility, Pick-n-Pull shall give written notice of this Consent Decree to each purchaser or successor in interest. Pick-n-Pull also shall give written notification to Plaintiff, in accordance with Part XXII (NOTICES AND SUBMISSIONS), of the anticipated sale or transfer of ownership or operation of the Facilities at least thirty (30) days prior to the scheduled date of such sale or transfer and may seek from the Court a modification of this Decree that would transfer responsibility for compliance with some or all of these provisions to its successor. The Court shall grant such request if the successor is ready, willing and able to fully implement obligations the successor would assume under this Consent Decree.

## V.  STORM WATER QUALITY IMPROVEMENT MEASURES
### A.        Storm Water Pollution Control Measures

15. In addition to maintaining the current BMPs at the Facilities, as identified in the Facilities' SWPPPs, Pick-n-Pull shall develop and implement the additional BMPs identified herein, as well as any other BMPs necessary to comply with the provisions of this Consent Decree and the Storm Water Permit. Specifically, Pick-n-Pull shall develop and implement BMPs with the goal of preventing and/or reducing the level of pollutants in storm water discharged from the Facilities below the Tier Two Levels in Table 1, attached as Exhibit 1 to this Consent Decree, and to use best efforts to reduce the levels of pollutants in storm water discharges below the Tier One Levels in Table 1. An exceedance of a Tier One or Tier Two Level, by itself, shall not be considered a violation of this Consent Decree.

16. The minimum BMPs to be developed and implemented are set forth below.

        a.        **516B Dolan Road Facility - Processing Area BMPs**

                i.        Prior to the start of the 2015-2016 Wet Season, Pick-n-Pull shall replace all bins used in the production area with bins that have attached covers or that are otherwise capable of being covered (tarped) prior to the start of forecasted rain events.

ii.      Within sixty (60) days of the Effective Date, Pick-n-Pull shall deploy metal sorbing socks (e.g., Filtrexx Metals Sorb http://www.filtrexx.com/metals-removal/ or similar) at the down-gradient edge of the crush pad in addition to the oil sorbing sock already in use and at all storm drain inlets at the Facilities. Within sixty (60) days of the Effective Date, Pick-n-Pull shall also deploy polymer floc socks at all the storm drain inlets at the Facilities, prior to the media filters.

iii.     Throughout the 2015-2016 Wet Season, during each rain event, Pick-n-Pull shall conduct visual observations of the driveway of the Production Area that leads to Dolan Road to determine whether storm water is flowing onto Dolan Road. If flow is observed during any rain event, Pick-n-Pull shall evaluate the most effective means of preventing storm water from discharging from this location (e.g., installation of a berm and/or drain inlet on the driveway) and shall implement the selected BMP no later than August 31, 2017.

iv.     Prior to August 31, 2016, to the extent that berming does not already exist along the northern and eastern borders of the Production Yard, additional berming shall be installed to prevent uncontrolled runoff from those locations.

v.      Prior to August 31, 2017, Pick-n-Pull shall pave the entire area within the fenced areas designated as the Production Yard and Vehicle Receiving/De-garbaging Area in Pick-n-Pull's April 2015 SWPPP and shall concurrently repave the concrete crush pad area.

b.      **Automobile Fluid Draining Operations:**

i.      Immediately upon the Effective Date, Pick-n-Pull shall continue to drain all "bottom fluids" (fuels, motor oils, radiator fluids (antifreeze) and transmission fluids) from vehicles in the "Designated Fluid Draining Area" at the 516B Dolan Road Facility (the Main Yard) and shall not conduct any vehicle draining operation at the 516A Dolan Road Facility (the Premier Yard).  Defendant shall include such structural BMPs in its Structural BMPs Plan, as required by Paragraph 16.h.ii., as are necessary to ensure that the Designated Fluid Draining Area is paved, under cover,

with secondary containment for all drained fluids. Pick-n-Pull may continue to conduct all hand evacuation of "top fluids" (windshield wiper fluid, brake fluid, power steering fluid and refrigerants) in the Vehicle Receiving/De-garbaging Area using a vacuum pump and sealed containment vessel to avoid accidental discharge of top fluids onto the ground.

ii.      Pick-n-Pull shall drain automotive fluids out of non-operational vehicles stored at the Facility within five (5) days after receipt of all necessary legal clearances from the Department of Motor Vehicles, the County of Monterey or any law enforcement agency.  In cases where vehicles are not expected to be cleared within 45 days of receipt due to an impound directive from law enforcement personnel or the DMV, Pick-n-Pull shall place the impounded vehicles in a designated area or areas within the Main Yard or the Premier Yard and shall implement BMPs to contain and clean up leaks of automotive fluids that are observed.

iii.      Within forty-five (45) days of the Effective Date, Pick-n-Pull shall post adequate signage throughout the Facility in English and Spanish to ensure employees know and understand that bottom fluids cannot be drained in areas other than in the Designated Fluid Draining Area.

iv.      Within 30 days of the Effective Date, Pick-n-Pull shall ensure that spill kits containing sorbent pads, sorbent socks, granular absorbent, and bags for proper disposal are available in the Designated Fluid Draining Area and in the Vehicle Receiving/De-garbaging Area where hand evacuation of top fluids is conducted.

c.      **Impervious Surfaces:**

i.      Cleaning: Prior to the onset of the 2015-2016 Wet Season, Pick-n-Pull shall thoroughly steam-clean all impervious (paved) ground surfaces at the Facilities. Pick-n-Pull shall steam-clean the crushing area first and then schedule the remaining impervious ground surfaces so that all such surfaces are steam-cleaned and patched (see (ii) below) prior to each subsequent Wet Season. While steam-cleaning, Pick-n-

Pull shall block all discharge points to prevent any wash water from discharging from the Facilities and shall dispose of all generated wash water off-site in accordance with all applicable laws.

ii.     Patching: Within ten (10) days of steam-cleaning an impervious ground surface as required by the preceding subparagraph, Pick-n-Pull shall patch all significant cracks in that impervious ground surface.

iii.    Sweeping:  Commencing October 1, 2015, Pick-n-Pull shall contract with a third party to sweep all accessible paved areas of the Facilities, and the road between the two Facilities, with a regenerative sweeper. Sweeping shall be conducted according to the following schedule: (1) twice a month during the Wet Season, and (2) once per month during the Dry Season.  During the Wet Season, Pick-n-Pull shall endeavor to schedule the regenerative sweeper so that the twice-monthly sweeping events are conducted at least twenty-four (24) hours prior to any precipitation event where more than 0.1 inches of rain is predicted with a minimum likelihood of occurrence of 50% by the nearest National Oceanic and Atmospheric Administration rain gauge.  Paved areas of the Facilities that cannot be accessed by the regenerative sweeper shall be swept using a front loader with a broom attachment or manually, as appropriate, in accordance with the Site Housekeeping Plan required by Paragraph 16.e.i.

d.      **Customer Access and Use of Facilities:**

i.      Within thirty (30) days of the Effective Date, Pick-n-Pull shall post adequate signage in the customer parking lot at both Facilities in English and Spanish, and take other measures as necessary, to ensure that customers and other individuals do not use any portion of the customer parking lot for the Facility for any automobile repair or dismantling activities.

ii.     Within thirty (30) days of the Effective Date, Pick-n-Pull shall post adequate signage in English and Spanish in the customer yard of both Facilities to require customers to close hoods of vehicles when finishing part(s) removal.

iii.     Within thirty (30) days of the Effective Date, Pick-n-Pull shall require Facility employees to close all vehicle hoods at each Facility at least one (1) hour prior to the start of forecast precipitation with a likelihood of occurrence of 50% or greater by the nearest NOAA rain gauge. So long as Pick-n-Pull uses best efforts to ensure that all vehicles are closed as described, the presence of open vehicle hoods in the Customer Yard, during rain events or otherwise, shall not be considered a violation of this Consent Decree.

iv.     Pick-n-Pull shall require Facility employees to close bins in the Production Area of the 516B Dolan Road Facility at least one (1) hour prior to the start of forecast precipitation with a likelihood of occurrence of 50% or greater by the nearest NOAA rain gauge.

e.     **Site Housekeeping Plan**:

i.     Within sixty (60) days of the Effective Date, Pick-n-Pull shall modify the BMPs currently contained in the Facilities' SWPPPs as necessary to ensure that the sweeping and cleaning actions deployed at the Facilities, in conjunction with other appropriate BMPs, are sufficient to reduce the potential for pollutants to become entrained in storm water flows, to prevent pollutants from being blown off the Facility, to keep all paved areas of the Facility as clean as practicable, and to prevent pollutants from being tracked off the Facility onto surface streets.  Pick-n-Pull's sweeping and cleaning BMPs shall be specified in detail in the Facilities' Housekeeping Plan and shall specifically include at least the following measures: (a) identification of areas where mechanical sweeping is feasible by regenerative sweeper or mechanical broom, areas where manual sweeping only, as needed, is feasible, and areas where sweeping is not feasible (such as unpaved areas, or under piles of materials that are not reasonably movable), (b) Wet Season and Dry Season schedules for mechanical and manual sweeping of areas identified as appropriate for daily sweeping, except during periods of rain, (c) Wet Season and Dry Season schedules for sweeping of the public streets and curbs, where accessible, with a

regenerative sweeper for approximately two hundred (200) feet from the Facility entrances, which sweeping may be coordinated with the sweeping of impervious areas described in paragraph c.iii. above, (d) triggers for more frequent ad hoc sweeping or cleaning such as visual accumulation of dust or debris, (e) a schedule for the annual inspection and comprehensive site cleaning, (f) hand sweeping of curbs downstream of the Facility and small berms in driveways as needed based on observations during Facility inspections to keep materials from lodging in these areas where they can be picked up by storm water and deposited into area storm drains, and (g) specification that Pick-n-Pull will collect and dispose of all wastes generated during Facility cleaning and sweeping in a manner that complies with all local, state, and federal laws.

ii. **Site Housekeeping Log**:  Pick-n-Pull shall keep a log or checklist, as appropriate, of the sweeping and any other site cleaning activity performed which identifies the employee and/or contractor who conducted the sweeping or cleaning, the location of the sweeping or cleaning, and the date of the sweeping or cleaning activities. The form for this log or checklist shall be adopted by Pick-n-Pull as part of the Site Housekeeping Plan referred to in the preceding paragraph. Pick-n-Pull shall direct employees and/or contractors to accurately complete this form for those sweeping and cleaning actions specified in such log in accordance with the Site Housekeeping Plan. Pick-n-Pull shall make the sweeping and cleaning log or checklist available for inspection by Plaintiff at the site inspection authorized herein or otherwise with five (5) business days advance request by Plaintiff.

iii. Plaintiff shall have twenty-one (21) days from receipt of the Housekeeping Plan to propose any changes or modification to be added to meet the intended goal of preventing contaminants from being moved around and offsite from the Facility, reducing pollutants in storm water flows, keeping all paved areas of the Facility clean and visible, and preventing pollutants from being tracked off the Facility onto surface streets.  Within 30 days of receiving Plaintiff's comments on

the Housekeeping Plan, Pick-n-Pull shall make all requested changes or provide Plaintiffs with a written explanation if Pick-n-Pull declines to implement or develop any of Plaintiff's recommendations.

f.   **Facility-Wide BMPs:**

i.   Consistent with the Facilities' current SWPPPs, Pick-n-Pull shall limit storm water discharges to only the Designated Discharge Locations (outfalls) designated in the SWPPP for each Facility.

ii.   Within thirty (30) days of the Effective Date, Pick-n-Pull shall inspect the perimeter of each Facility and implement such measures as are necessary to prevent water from discharging from the Facilities perimeter at any location other than Designated Discharge Locations.

iii.   Within thirty (30) days of the Effective Date, Defendant shall post adequate signage in English and Spanish at each Facility requiring employees to report to the Facility Manager any vehicle that has not been drained of fluid(s) before being placed in the customer use area. This provision shall not apply to minor leaks or drips of residual automotive fluids that may occur from vehicles after they have been properly drained as set forth in Paragraph 16(b)(i-ii) above.

iv.   Within thirty (30) days of the Effective Date, Defendant shall post adequate signage in English and Spanish in the Production Area at the 516-B Dolan Road Facility requiring that fuels, lubricating oils, hydraulic oils, engine coolant, batteries, mercury switches and refrigerant gases be removed from each vehicle prior to crushing.

v. Within thirty (30) days of the Effective Data, Pick-n-Pull shall install a rain gauge and data logger so that accurate on-site precipitation data is available for use in determining whether any bypass events have occurred as set forth in paragraph 28 below.

g.  **Storm Water System:**

    i.    Prior to the onset of the 2015-2016 Wet Season, Pick-n-Pull shall clean all components of the storm water conveyance system at each Facility.

    ii.    For each successive year that this Consent Decree is in effect, Pick-n-Pull shall clean the Jensen pre-cast units at each Facility prior to the beginning of the Wet Season and again by the end of January.

    iii.    Pick-n-Pull shall regularly monitor and maintain the storm water conveyance system and treatment or retention structures at each Facility in a manner that ensures they are kept free of debris and materials not related to the control and treatment of storm water (*e.g.*, wood, metal, concrete and other debris).

    iv.    From June 1 to September 30 of each year that this Consent Decree is in effect, Pick-n-Pull shall cover each storm water drop inlet with a solid material that will prevent dust and solids from collecting in the inlet. These covers may be removed prior to the start of any forecasted precipitation with a likelihood of occurrence of 50% or greater as determined by the NOAA forecast for the Moss Landing area available at http://www.wrh.noaa.gov/mtr/.

h.  **Structural BMPs:**

    i.    Temporary Storage:  Prior to the onset of the 2015-2016 Wet Season, Pick-n-Pull shall install temporary storm water storage facilities of no less than twenty thousand (20,000) gallons capacity for the Production Area at 516B Dolan Road.  The temporary storage facilities shall be utilized to allow for additional water retention/settling prior to storm water reaching the StormwateRx system and reduce the potential for storm water discharges to bypass the treatment system during storm events that do not exceed the Design Storm.

    ii.    Structural BMPs Plan: Prior to July 1, 2016, Pick-n-Pull shall prepare and provide to Plaintiff a plan for evaluating structural BMPs at both Facilities capable of providing treatment to all storm water discharges to a level commensurate with Best Available Technology Economically Achievable (BAT) and the Best Conventional

Pollutant Control Technology (BCT) and any other measures necessary to prevent storm water discharges from causing or contributing to an exceedance of applicable water quality standards for Elkhorn Slough. The storm water sampling results collected during the first year of the Consent Decree shall be considered during the evaluation of the structural BMP improvements. The objective of the Structural BMPs shall be to obtain sufficient storm water storage and/or treatment capacity so that all storm water is effectively treated to eliminate or reduce pollutants prior to discharge in any storm that does not exceed the Design Storm (*i.e.*, storm water discharges should only bypass the treatment system during storm events that exceed the Design Storm).

      iii.     Pick-n-Pull shall consider the following options for improving storm water treatment capability at the Facilities and prepare a Structural BMP Plan that includes some or all of the following components, or a combination thereof, as determined through an engineering evaluation of site hydrology, lithology and other relevant factors:

          1.     Installing additional holding tanks or other forms of storm water storage at Outfall 2B to allow for additional water retention/treatment prior to storm water reaching the StormwateRx system.

          2.     Upgrading the current system to the StormwateRx Purus treatment unit or equivalent alternative systems by other manufacturers.

          3.     Diverting all storm water from the customer yard that is currently directed to the inlet at Outfall 2B to instead flow to outfall 1B, or ensuring sufficient treatment capacity at Outfall 2B to accommodate the additional flow from the customer yard.

          4.     Installing infiltration basins around outfall 1B at the 516B Dolan Road Facility, and around outfalls 1A and 2A at the 516A Dolan Road Facility.

The Structural BMP Plan shall also include engineer approved calculations of the design storm standards for the volume of water generated in the 516B Dolan Road Facility Production Area and the Dolan Road 516A and 516B Customer Yards that are based on historical rain data from the NOAA weather station in Castroville.

iv.     Structural BMP Plan Review: Plaintiff shall have thirty (30) days upon receipt of Pick-n-Pull's Structural BMP Plan to provide Pick-n-Pull with comments. Within thirty (30) days of Pick-n-Pull's receipt of Plaintiff's comments on the Structural BMP Plan, Pick-n-Pull shall accept and incorporate Plaintiff's comments into the Plan, or shall provide Plaintiff with a written explanation if Pick-n-Pull declines to develop and/or implement any of Plaintiff's recommendations. Any disputes as to the adequacy of the Structural BMP Plan shall be resolved pursuant to the Dispute Resolution provisions of Part XI (DISPUTE RESOLUTION).

v.     Structural BMP Plan Implementation: Pick-n-Pull shall implement the Structural BMP Plan, as revised, no later than August 31, 2017.  Pick-n-Pull shall thereafter properly operate and maintain the treatment and/or storm water retention system for the life of the Consent Decree.

i.     **Good Housekeeping:**

i.     Pick-n-Pull shall operate the Facilities such that activities that generate dust, fine particulate matter, or other materials that can be tracked or entrained in storm water discharging from the Facilities are principally conducted within designated Industrial Activity Areas shown on the Site Map prepared pursuant to paragraph 22.

ii.     Pick-n-Pull shall maintain and operate the Facilities to minimize to the extent practicable the generation or accumulation of pollutants that may become entrained in storm water discharges.

**B.       Reduction of Pollutants in Discharges**

17. Action Plan for Table 1 Exceedances: Pick-n-Pull shall submit an Action Plan for reducing the level of pollutants in storm water discharges from the Facilities in any of the following circumstances:

      a.     If the average of all storm water analytical results in a given wet season for individual pollutant(s) exceeds the applicable Tier Two Level as set forth in Table 1;

      b.     If any storm water sample contains a single pollutant at a concentration that exceeds a Tier Two level for any particular pollutant(s) by a factor of 3 or more; or

      c.     If the average of all storm water analytical results for copper or lead exceeds the applicable Tier One Level by a factor of 5 or more.

Notwithstanding the foregoing, an Action Plan shall not be required if the triggering discharge(s) are attributable to a legitimate bypass event, i.e., where the volume of storm water exceeds the Design Storm for a treatment BMP. In calculating the average of storm water sampling results for a particular pollutant, Pick-n-Pull shall average only those results collected from a single outfall (i.e., all storm water outfalls will be evaluated separately). An exceedance of a Tier One or Tier Two level, by itself, shall not be considered a violation of this Consent Decree, the Storm Water Permit or the CWA.

18. Action Plan Requirements: Each Action Plan submitted shall include at a minimum: (1) the identification of the contaminant(s) discharged in excess of the Tier One or Two Level(s), (2) an assessment of the source of each contaminant exceedance, (3) the identification of additional BMPs, including treating storm water prior to discharge from the Facilities, that will be implemented to reduce pollutant concentrations in the discharge, and (4) time schedules for implementation of the proposed BMPs. The time schedule(s) for implementation shall ensure that all BMPs are implemented as soon as possible, but in no case later than October 1 (prior to the next Wet Season). The following BMPs should generally be evaluated as a means of reducing pollutant concentrations:

a.  <u>Hydraulic Controls</u>:  installation of additional berms or equivalent structural controls (if necessary to reduce or prevent storm water from flowing into or, other than through the engineered storm water conveyance system or storm water retention or treatment facilities).

b.  <u>Detention</u>: additional on-site retention or infiltration of storm water to minimize storm water discharges (overall or from specific areas) or to detain storm water runoff for sufficient detention time so as to reduce pollutants in the discharge.

c.  <u>Visual "Track Off" To Public Streets</u>:  additional BMPs necessary to reduce or prevent visual "track off" of material from the Facilities onto public streets.

d.  <u>Paving Additional Unpaved Areas</u>: to the extent not already implemented by other sections of this Consent Decree, paving appropriate portions of unpaved portions of the Facilities where significant vehicle traffic occurs.

e.  <u>Treatment Systems</u>: installing or improving treatment systems that would provide more effective treatment of storm water prior to discharge than currently installed systems, such as a fixed bed filter system or other improved filter system.

f.  <u>Evaluation of BMPs</u>:  replacing, rehabilitating, or eliminating existing BMPs, taking into account the age of the BMPs involved or employed, the engineering aspect of the application of various BMPs, and any adverse environmental impact of the BMPs.

g.  Such other additional BMPs as Pick-n-Pull deems appropriate for evaluation.

19. Action Plan Submittal:  In any year that an Action Plan is required, Pick-n-Pull shall provide the Action Plan to Plaintiff by June 30 following the Wet Season for which exceedance was reported; provided, however, that for the Wet Season ending May 30, 2016, Pick-n-Pull may satisfy the requirement to submit an Action Plan through submittal of the Structural BMP Plan required by Paragraph 16.h.ii.

20. Action Plan Review: Plaintiff shall have thirty (30) days upon receipt of Pick-n-Pull's Action Plan to provide Pick-n-Pull with comments. Within thirty (30) days of Pick-n-Pull's receipt of Plaintiff's comments on the Action Plan, Pick-n-Pull shall incorporate Plaintiff's comments of

recommended additional BMPs into the Action Plan, or shall provide Plaintiff with a written explanation if Pick-n-Pull refuses to develop and/or implement any of Plaintiff's recommended additional BMPs. Disputes regarding the adequacy of a particular BMP shall not impact the schedule for implementing any other BMP set forth in the Action Plan. Any disputes as to the adequacy of the Action Plan shall be resolved pursuant to the Dispute Resolution provisions of Part XI (DISPUTE RESOLUTION).

21. Pick-n-Pull shall contact Plaintiff to request an extension of the deadline, if necessary, to implement any structural BMPs requiring agency approval. Plaintiff's consent to Pick-n-Pull's requested extension shall not be unreasonably withheld.

22. When an Action Plan is completed and approved by Plaintiff or finalized pursuant to dispute resolution, Pick-n-Pull shall revise its SWPPP and Monitoring & Reporting Plan ("M&RP") as applicable within thirty (30) days to reflect the changes required by the Action Plan. Pick-n-Pull shall notify Plaintiff in writing when the Action Plan has been completely implemented, which shall be no later than two (2) months after the approval by Plaintiff or dispute resolution finalizing the Action Plan, or after all necessary construction permit approvals have been obtained, whichever is later, unless Plaintiff and Pick-n-Pull agree in writing upon an alternate implementation schedule due to the nature of the changes that are required. Defendant shall implement any Action Plan approved pursuant to this paragraph as a requirement of the Consent Decree.

**B.   Site Mapping**

23. <u>Site Mapping</u>: Within sixty (60) days of the Effective Date, Pick-n-Pull shall update as necessary the Site Maps for the 516B Dolan Road and 516A Dolan Road Facility SWPPPs. The Site Maps shall clearly identify the property boundaries, ground type (pervious or impervious) on all portions of the Facility; berms, dikes, walls and all other structures controlling the flow of surface water, all components of the Facility storm water conveyance system, including but not limited to all storm water pipes, drop inlets, any storm water storage or treatment infrastructure (as well is the capacity of such infrastructure) and all other physical structures or items relevant under this Consent Decree. The Site Map shall further indicate the direction and pattern of storm water flows at and off the Facility.

24. <u>Designated Discharge Points</u>:  Within sixty (60) days of the Effective Date, to the extent not already implemented, Pick-n-Pull shall identify on the Site Maps every location at which storm water and non-storm water is known to be discharged or which may potentially be discharged including all driveways ("Designated Discharge Points or Designated Discharge Locations"). Each Designated Discharge Point or Discharge Location shall be numbered and clearly labeled on the Site Maps.

25. <u>Designation of Storage Areas</u>:  The outdoor storage areas at the Facility where materials used at the Facility are stored ("Material Storage Areas") shall be designated on the Facility's Site Map.

26. <u>Pollutant Generating Activities</u>:  The Site Map for each Facility shall fully describe all industrial activities that generate dust, particulates or other pollutants that may be deposited within the Facility's boundaries and identify their discharge locations and the characteristics of such dust, particulate and other pollutants; and a description of the primary areas of the Facility where dust, particulate and other pollutants would settle.

27. <u>Designation of All Sampling Locations</u>: The Site Map shall set identify precisely where storm water samples are to be collected.

## VI. SAMPLING, MONITORING, INSPECTION & REPORTING
### A. Sampling Program

28. Pick-n-Pull shall collect storm water discharge samples from each Discharge Point at the Facilities according to the following sampling schedule:

a. During the first and second year of this Consent Decree, and except as set forth below in this paragraph, Pick-n-Pull shall collect five storm water samples per year from each Discharge Point at the Facilities. If four consecutive samples from each of the Discharge Points result in pollutant levels below the Tier Two levels set forth in Table 1 for any parameter sampled, Pick-n-Pull need not conduct additional sampling for such parameter unless otherwise required by the Storm Water Permit.

b. During the third year of this Consent Decree, Pick-n-Pull shall collect four storm water samples from each Discharge Point at each Facility.

c.    Pick-n-Pull shall analyze each storm water sample collected for each of the parameters listed on the Table 1. Should operations change at the Facility, Pick-n-Pull shall conduct sampling for any additional toxic priority pollutants listed in 40 C.F.R. § 131.38 likely to be present in Pick-n-Pull's storm water discharges as a result of the changed operations.

d.    Where Pick-n-Pull discharges storm water into a storm drain inlet or catch basin, Pick-n-Pull may choose to collect a sample below any insert or treatment system. If Pick-n-Pull chooses not to collect a post-filtration or post-treatment sample, the quality of storm water samples entering a storm drain inlet or catch basin containing a fabric insert shall be considered the same as a sample collected below the insert.

e.    During the term of the Consent Decree, Pick-n-Pull shall monitor Outfall 2B at the 516B Dolan Facility and document instances where storm water has bypassed the Stormwater Rx unit due to exceedance of Design Storm capacity as discussed below or other mechanical circumstances documented by Pick-n-Pull. Each Wet Season that the Consent Decree is in effect, Pick-n-Pull shall sample at least one bypass discharge which occurs during normal business hours and provide the results according to Paragraph 32 below; if a second bypass occurs during the same Wet Season, a sample from that event shall also be collected. Pick-n-Pull shall not be required to sample any bypass event which occurs outside normal business hours.

f.    Exceedance of Design Storm capacity shall be determined by referencing the on-site rain data and comparing the number of inches from the onset of precipitation in a given day over the following 24 hours to the number of inches generated by the 85th percentile 24-hour storm event.

29. Sampling events shall occur at least 24 hours apart and be preceded by at least 48 hours without storm water discharges.

30. If Pick-n-Pull does not collect the required number of samples from the designated sampling locations due to lack of discharge, Pick-n-Pull shall explain in its Annual Report or any Action Plan required by this Consent Decree that rainfall was insufficient for collection of samples.

31. Pick-n-Pull shall deliver all storm water samples collected pursuant to this Decree to a California state certified environmental laboratory for analysis within the time needed for analysis within laboratory method allowable hold times. Pick-n-Pull shall direct the laboratory to conduct analysis sufficient to detect individual constituents at or below the Tier One and Tier Two Levels set forth in the attached Table 1.

32. Pick-n-Pull shall provide to Plaintiff complete results from Pick-n-Pull's sampling and analysis of storm water discharges to Plaintiff within fourteen (14) days of receipt of the laboratory report from each sampling event. Each time Pick-n-Pull receives sampling results, Pick-n-Pull shall provide Plaintiff with a chart in digital or hardcopy form that summarizes the results of all the samples and includes the Tier One and Tier Two Levels for comparison. The summary chart shall consistently present the sample summaries in micrograms per liter for all of the parameters for which concentration values are provided.

## B.  Visual Observations

33. Wet Weather Visual Observations: During the term of this Consent Decree, Pick-n-Pull shall conduct visual observations, during normal operating hours, at the point at which each discharge crosses the property line, during two rain events per month that produce a discharge. During these rain events, Pick-n-Pull shall also observe all potential discharge locations on the perimeter of the Facility to determine if discharge of storm water is occurring.

34. During such wet weather visual observations, appropriately trained Pick-n-Pull employees shall monitor for the presence of visually observable oil sheens in storm water discharges and/or discolored or turbid storm water discharges.

35. Dry Weather Visual Observations: In accordance with the current SWPPPs, appropriately trained Pick-n-Pull employees shall conduct weekly visual BMP inspections of the Facility, including during dry weather. Such inspections shall include driveways, outdoor storage areas, and all Industrial Activity Areas. All Designated Discharge Locations shall also be inspected for accumulation of dust,

sediment, sand, grit, oily substances, oily sheens upon any standing water, and other materials associated with operations at the Facility. Such inspections shall further include observations of all storm water BMPs at the Facility to ensure that operational BMPs are being implemented, structural BMPs are in good condition or working order, and that BMPs have been effective in producing clean conditions at the Facility to the extent practicable (*e.g.*, an absence of significant oil stains on paved or unpaved surfaces, absence of metal debris or other debris on paved or unpaved surfaces, absence of oil, or metal or other debris or grit in storm water conveyance structures).

### C.    Compliance Monitoring

36. <u>Site Inspections</u>: Plaintiff and its representatives may conduct one site inspection per year at the Pick-N-Pull Facility during the life of this Consent Decree. The site inspections shall occur during normal business hours and Plaintiff shall provide Pick-n-Pull with forty-eight (48) hours notice. Where Plaintiff is unable to provide 48 hours notice due to the unexpected nature of a storm event, Plaintiff shall provide Pick-n-Pull with as much advance notice as is possible but in no event less than twenty-four (24) hours notice.

37. During the site inspections, Plaintiff and/or its representatives shall be allowed access to the Facility's SWPPP, M&RP, and other monitoring records, reports, and sampling data for the Pick-N-Pull Facility. During the site inspections, Plaintiff and/or its representatives may collect samples of discharges from the Facility. A certified California laboratory shall analyze storm water samples collected by Plaintiff and copies of the lab reports shall be provided to Pick-n-Pull within five (5) business days of receipt. At the request of Pick-n-Pull, the samples shall be split and one half provided to Pick-n-Pull so as to allow Pick-n-Pull to have their own certified California laboratory analyze the samples, in which case Pick-n-Pull shall provide the laboratory results to Plaintiff within five (5) business days of receipt.

### D.    Cleaning, Maintenance, and Inspection Logs

38. During the life of this Consent Decree, Pick-n-Pull shall keep contemporaneous logs documenting the performance of cleaning and maintenance activities performed pursuant to paragraph 16 and inspection activity performed pursuant to paragraphs 33-36. The logs shall indicate the personnel who completed the cleaning, maintenance, or inspection activity and the date the

activity was performed. The logs shall further include notes sufficient to describe the completed

activity and any pertinent information that the activity yielded (*e.g.*, such as whether BMPs are an

adequate condition or whether the Facility is free of oil, debris, or other conditions likely to lead to

pollutant loading in storm water discharges). The logs shall be made available to Plaintiff at the time

of any site inspection.

E.     **Reporting**

39. During the life of this Consent Decree, Pick-n-Pull shall provide Plaintiff with a copy of all

documents pertaining to the General Permit submitted to or received from the Regional Board or the

State Board concerning the Facility, including all documents and reports submitted to the Regional

Board as required by the General Permit. Pick-n-Pull shall also provide Plaintiff with a copy all

documents relating to its Coastal Development Permit application submitted to or received from

County of Monterey Resource Management Agency. Documents and reports sent by Pick-n-Pull to

the Regional Board, State Board, or the County of Monterey Resource Management Agency shall be

electronically mailed to Plaintiff contemporaneously with submission to the respective agency.

Documents received by Pick-n-Pull from the Regional Board, State Board, and/or the County of

Monterey Resource Management Agency shall be electronically mailed to Plaintiff within three (3)

business days of receipt.

40. Pick-n-Pull shall provide Plaintiff with a copy of its Annual Report on July 1 each year

documenting measures taken by Pick-n-Pull to comply with the Decree and providing Plaintiff with

summary tables of all storm water sample test results for the Facility, field notes documenting visual

inspections at the Facility, and cleaning, maintenance, and inspection logs prepared pursuant to

paragraph 38. Pick-n-Pull shall also provide Plaintiff with the on-site rain gauge data in tabular or

spreadsheet form for the previous Wet Season as part of the Annual Report.

**VII.   EMPLOYEE TRAINING**

41. Within thirty (30) days of the Effective Date, Pick-n-Pull shall modify as necessary and

implement a training program, including any training materials needed for effective implementation

of the training program, to ensure (1) that there are a sufficient number of employees delegated to

achieve compliance with the Storm Water Permit and this Consent Decree, and (2) that these

employees are properly trained to perform the required compliance activities ("Training Program"). At a minimum the Training Program shall familiarize all employees at the Facility with the requirements of the Storm Water Permit and this Consent Decree.

42. To the extent necessary, the Training Program shall be revised to require specific training on the following topics for all personnel whose jobs include some aspect of responsibility for stormwater compliance:

      a. <u>Non-Storm Water Discharge Training</u>: Pick-n-Pull shall train all employees on the Storm Water Permit's prohibition of non-storm water discharges, so that employees know what non-storm water discharges are, which can result from improper draining of automobile fluids, and how to detect them and prevent them;

      b. <u>BMP Training</u>: Pick-n-Pull shall train all employees on BMP implementation and maintenance to ensure that BMPs are implemented effectively to prevent the exposure of pollutants to storm water, to prevent the discharge of contaminated storm water, and to ensure the proper treatment of storm water at the Facility;

      c. <u>Sampling Training</u>: Pick-n-Pull shall designate adequate number of employees necessary to collect storm water samples from each discharge location as required by this Consent Decree and/or the Storm Water Permit. The training shall include the proper sampling protocols, including chain of custody requirements, to ensure storm water samples are properly collected, stored, and submitted to a certified laboratory;

      d. <u>Visual Observation Training</u>: Pick-n-Pull shall provide training to all individuals performing visual observations at the Facility pursuant to this Consent Decree and/or the Storm Water Permit.

43. Training shall be provided on an annual basis, or as otherwise required to ensure compliance with the terms of this Consent Decree, by a private consultant or a representative of Pick-n-Pull who is familiar with the requirements of this Consent Decree and the Storm Water Permit. The training shall be repeated as necessary to ensure that covered employees are familiar with the requirements of this Consent Decree, the Storm Water Permit, and the Facility's SWPPP and M&RP. All new

1   personnel shall receive this training before assuming responsibilities for implementing the SWPPP

2   and/or M&RP.

3       44. Pick-n-Pull shall maintain training records to document compliance with this section, and

4   shall provide Plaintiff with a copy of these records within fourteen (14) days of receipt of a written

5   request. The Training Program shall be specified in the SWPPP.

## VIII.   STORM WATER POLLUTION PREVENTION AND MONITORING AND REPORTING PLAN

        45. Within sixty (60) days after the Effective Date of this Consent Decree, Pick-n-Pull shall revise its SWPPP and its M&RP to:

    a.  Incorporate the requirements of the Storm Water Permit, and this Consent Decree,
        including but not limited to revisions to the SWPPP to specify performance of the
        measures referred to in PART V (STORM WATER QUALITY IMPROVEMENT
        MEASURES), *e.g*., the auto fluid draining; cleaning sweeping and patching of
        impervious surfaces, customer use restrictions, facility wide BMPs, cleaning and
        maintenance of the storm conveyance system, structural BMPs, good housekeeping
        measures, and site mapping specified in this Part V.C.;

    b.  Identify the positions responsible for compliance with each aspect of the Storm
        Water Permit and this Consent Decree;

    c.  Describe all BMPs and how they will be operated and/or maintained;

    d.  Denote all actions taken to control the deposition of dust, particulate matter and other
        pollutants at the Facility;

    e.  Describe where and when storm samples are to be collected and explain why the
        sample points are representative of off-site discharge and include a checklist that
        must be used by trained Facility personnel when conducting the storm water
        sampling required under the Storm Water Permit and/or under this Consent Decree;

    f.  Describe where and when visual inspections of the Facility are to be performed and
        include a visual inspection checklist that must be used by trained Facility personnel

1    when conducting the visual observations required under the Storm Water Permit
2    and/or under this Consent Decree; and

3    g.   Describe the type, direction, and volume of vehicle traffic at the Facility.

4    46. Commenting on the SWPPP and M&RP Revisions: Pick-n-Pull shall submit the revised
5    SWPPP and M&RP to Plaintiff for review and comment as soon as it is completed but in any event
6    no later than thirty (30) days after the Effective Date. Plaintiff shall provide comments, if any, to
7    Pick-n-Pull within thirty (30) days of receipt of the SWPPP and M&RP. Pick-n-Pull shall incorporate
8    Plaintiff's comments into the SWPPP and M&RP or shall justify in writing why any comment is not
9    incorporated within thirty (30) days of receiving Plaintiff's comments.

10    47. Additional Revisions to SWPPP and M&RP: Pick-n-Pull shall revise the SWPPP and
11    M&RP if there are any changes in the Facility's operations, including but not limited to changes to
12    storm water discharge point(s) or changes or additions to the BMPs at the Facility resulting from an
13    Action Plan. Pick-n-Pull shall submit any revised SWPPP and M&RP to Plaintiff for review and
14    comment within five (5) days of completion. Plaintiff shall provide comments, if any, to Pick-n-Pull
15    within thirty (30) days of receipt of any revised SWPPP and M&RP. Pick-n-Pull shall incorporate
16    Plaintiff's comments into any revised SWPPP and M&RP, or shall justify in writing why any
17    comment is not incorporated within thirty (30) days of receiving comments.

18    **IX.  MITIGATION, FEES, AND COSTS**

19    48. Supplemental Environmental Project (SEP) Funding:  As mitigation of the violations alleged
20    in Plaintiff's Notice and Complaint, Pick-n-Pull shall pay the sum of $72,000 to the Rose Foundation
21    for Communities and the Environment ("Rose Foundation"). The SEP funds shall be spent
22    exclusively on projects designed to advance environmental restoration (including environmental
23    restoration work whose purpose is the improvement of water quality in the Elkhorn Slough and/or
24    Monterey Bay) or projects designed to study and/or enhance southern sea otter habitat in Elkhorn
25    Slough and/or Monterey Bay. Within 30 days of the Effective Date, Pick-n-Pull shall tender this
26    payment to the Rose Foundation for Communities and the Environment. The Rose Foundation shall
27    provide the parties identified in Paragraph 58 below a report that sets forth the organizations receiving

28

funds, a description of the project and its goals, and further itemizing the amounts provided to each organization.

49. <u>Reimbursement of Fees and Costs</u>:  Pick-n-Pull shall reimburse Plaintiff in the amount of one hundred fifteen thousand dollars ($115,000) to help defray Plaintiff's investigation fees and costs, expert fees and costs, reasonable attorneys' fees, and all other costs incurred as a result of investigating the activities at the Facility, bringing these matters to Pick-n-Pull's attention, and negotiating a resolution of this action in the public interest. Such payment shall be made within fifteen (15) days of the Effective Date.

50. <u>Compliance Monitoring Funds</u>:  Pick-n-Pull shall reimburse ERF seven thousand dollars ($7,000) per year for each of the years the Consent Decree is in effect for costs and fees associated with monitoring Pick-n-Pull's compliance with this Consent Decree. Monitoring activities include the authorized site inspection, review of water quality sampling reports, review of documents submitted pursuant to this Decree (other than Action Plans), discussion or written communication with representatives of Pick-n-Pull concerning potential changes to compliance requirements, water quality sampling, informal dispute resolution, and other actions necessary to monitor and ensure Pick-n-Pull's compliance with this Decree. The compliance monitoring fund payment shall be made payable to Environmental Advocates Attorney Client Trust Account. The first installment shall be paid within fifteen (15) days of the Effective Date, and the remaining installments shall be paid on October 1st for each of the following years that the Consent Decree is in effect; provided, however, that Pick-n-Pull shall not be responsible for more than three Compliance Monitoring Fund payments of seven thousand dollars ($7,000) each, plus any Action Plan Review payments or late payments, as described below.

## X. ACTION PLAN REVIEW AND OTHER PAYMENTS

51. If Pick-n-Pull is required to submit an Action Plan in accordance with Section V(B), it shall concurrently pay three thousand dollars ($3,000)  for ERF' review of the Action Plan. Action Plan Review payments shall be made payable to Environmental Advocates Attorney Client Trust Account.

52. In the event Pick-n-Pull fails to submit to Plaintiff any document, report or other communication required under paragraphs 14 (change in ownership), 16 (requests re implementation

of minimum BMPs),  19 (action plan submittal), 22 revision of SWPPP and M&RP), 32 (storm water sampling results), 39 (submittal of agency correspondence), 40 (Annual Report), 46 (SWPPP and M&RP updates), 47 (SWPPP and M&RP further revisions) of this Agreement, for any report more than five (5) days late, Pick-n-Pull shall pay a late payment of Five Hundred Dollars ($500) per day commencing on the sixth (6th) day after the report due date.

53. In the event Pick-n-Pull fails to complete a measure of specific performance required by (a) the dates specified in paragraphs 16(a), (b), (c), (g), (h) above; (b) the dates specified in 2016 Structural BMP Plan; or (c) the dates for implementation of BMPs specified in any future Action Plans pursuant to paragraphs 18, 21, or 22, Pick-n-Pull shall incur a late payment of Five Hundred Dollar ($500) per day commencing on the sixth (6th) day after the date by which the measure was to be completed or implemented.

54. If Pick-n-Pull fails to submit to any payments required under paragraphs 48-51 of this Consent Decree within five days of the date due, Pick-n-Pull shall incur a Five Hundred Dollar ($500) per day late payment commencing on the sixth (6th) day after the payment due date.

55.  Any stipulated payments are pursuant to this Part shall be paid to the Rose Foundation for Communities and the Environment within fourteen (14) days of the event that precipitated the Stipulated Payment liability. Stipulated payments shall be used for projects designed to advance environmental restoration in Elkhorn Slough and/or Monterrey Bay including environmental restoration work whose purpose is the improvement water quality in the Elkhorn Slough and/or Monterey Bay) or projects designed to study and/or enhance southern sea otter habitat in Elkhorn Slough and/or Monterrey Bay. Pick-n-Pull shall send Plaintiff notice of any such stipulated payments within seven (7) days of tendering such payments. The Rose Foundation shall provide the parties identified in Paragraph 58 below a report that sets forth the organizations receiving funds, a description of the project and its goals, and further itemizing the amounts provided to each organization.

## XI. DISPUTE RESOLUTION AND ENFORCEMENT OF CONSENT DECREE

56. <u>Dispute Resolution Process</u>: If a dispute under this Consent Decree arises, or either Party believes that a breach of this Consent Decree has occurred, the Parties shall schedule a meet and

confer within ten (10) calendar days of receiving written notification from the other Party of a request for a meeting to determine whether a violation has occurred and to develop a mutually agreed upon plan, including implementation dates, to resolve the violation. If the Parties fail to meet and confer or the meet and confer does not resolve the issue, after at least seven days have passed after the meet and confer occurred or should have occurred, either Party shall be entitled to all rights and remedies under the law, including bringing a motion before the District Court of California, Northern District, which shall retain jurisdiction over the Action for the limited purposes of enforcement of the terms of this Consent Decree. The Parties agree not to object to an expedited hearing schedule on any Dispute Resolution motion if one of the Parties requests one.

57. <u>Litigation Costs and Fees</u>: Litigation costs and fees incurred in conducting meet and confer or otherwise addressing and/or resolving any dispute, including an alleged breach of this Consent Decree, shall be awarded in accord with the standard established by Section 505 of the Clean Water Act, 33 U.S.C. §1365 and case law interpreting that standard.

## XII.   NOTICES AND SUBMISSIONS

58. Except as otherwise expressly provided in this Consent Decree, whenever under the terms of this Consent Decree notice is required to be given or a report or other document is required to be forwarded by one Party to another, it shall, to the extent feasible be sent to the following individuals as electronic computer files at the e-mail addresses specified below. If a given document cannot be e-mailed, it shall be mailed by U.S. Mail to the following addresses. Any change in the individuals designated by either Party must be made in writing to the other Parties.

As to Plaintiff:

Fredric Evenson
ECOLOGY LAW CENTER
P.O. Box 1000
Santa Cruz, CA 95061
Telephone: (831) 454-8216
Email: evenson@ecologylaw.com

Christopher A. Sproul
Environmental Advocates
5135 Anza Street
San Francisco, California  94121
Email:  csproul@enviroadvocates.com

As to the Defendant:

Scott Sloan
National Environmental Director
Schnitzer Steel Industries, Inc.
23711 63rd Avenue SE
Woodinville, WA 98072
Email:  ssloan@schn.com

Chris Orsolini
Regional Environmental Manager
Schnitzer Steel Industries, Inc.
1101 Embarcadero West
Oakland, CA 94607
Email:  corsolini@schn.com

Margaret Rosegay
Pillsbury Winthrop Shaw Pittman LLP
Four Embarcadero Center
San Francisco, CA 94111
Email:  margaret.rosegay@pillsburylaw.com

## XIII.   PAYMENTS

59. All payments to Plaintiff (other than payments of Supplemental Environmental Project

funding pursuant to paragraph 50 and Stipulated Payments pursuant to Part X shall be made by check

made payable to Environmental Advocates Attorney Client Trust Account. Payments shall be sent via

certified mail, return receipt requested, to the following address:

    Christopher A. Sproul
    Environmental Advocates
    5135 Anza Street
    San Francisco, California  94121

60. All Supplement Environmental Project funding pursuant to paragraph 50 and Stipulated

Payments pursuant to Part X shall be made by check payable to the Rose Foundation for

Communities and the Environment. Such payments shall be sent via certified mail, return receipt

requested, to the following address (with notice to the Plaintiff that such payments have been sent):

    Tim Little
    Rose Foundation for Communities and the Environment
    1970 Broadway, Suite 600
    Oakland, California  94612-2218

## XIV.   MISCELLANEOUS PROVISIONS

61. **Withdrawal of CDP Appeal**:  After court entry of this agreement and within fourteen days after the Parties reach agreement on the contents of Pick-n-Pull's Structural BMP Plan required under Paragraph 16.h.ii. hereof, Plaintiff shall submit a letter to the Monterey County Board of Supervisors withdrawing its appeal dated March 26, 2015 of the extension granted by the Monterey County Planning Commissions to the Facilities' Coastal Development Permits on March 11, 2015.  If necessary, Plaintiff will stipulate to a continuance of the currently scheduled hearing date for its appeal (August 19, 2016) to allow the Parties sufficient time to reach agreement on the Structural BMP Plan prior to the hearing.  Plaintiff's withdrawal of its appeal shall be with prejudice.  Pick-n-Pull is currently conducting a Biological Study at the request of the County and will complete that study.

62. **Execution in Counterparts:** The Consent Decree may be executed in one or more counterparts which, taken together, shall be deemed to constitute one and the same document.

63. **Severability**: In the event that any of the provisions of this Consent Decree is held by a court to be unenforceable, the validity of the enforceable provisions shall not be adversely affected.

64. **Construction**: The language in all parts of this Consent Decree, unless otherwise stated, shall be construed according to its plain and ordinary meaning.

65. **Integrated Consent Decree**: All agreements, covenants, representations and warranties, express or implied, oral or written, of the Parties concerning the subject matter of this Consent Decree are contained herein.

66. **Facsimile Signatures:** Signatures of the Parties transmitted by facsimile shall be deemed binding.

67. **Force Majeure**: No Party shall be considered to be in default in the performance of any of its obligations when a failure to perform is due to a "Force Majeure."  A Force Majeure event is any act of God, war, fire, earthquake, flood, natural catastrophe, and restraint by court order or public authority. A Force Majeure event does not include normal inclement weather or inability to pay. Any Party seeking to rely upon this paragraph shall have the burden of establishing that it could not reasonably have been expected to avoid, and which by exercise of due diligence has been unable to

overcome, the Force Majeure. The Parties shall exercise due diligence to resolve and remove any Force Majeure event.

68. The parties hereto enter into this Consent Decree, Order and Final Judgment and submit it to the Court for its approval and entry as a final judgment.

## XV.   EFFECTIVE AND TERMINATION DATES

69. Within three (3) days of the final signature of the Parties, Plaintiff shall submit this executed Consent Decree to EPA and DOJ for a 45-day review and comment period pursuant to CWA section 505(c)(3) and 40 C.F.R. § 135.5. The Court shall not enter its judgment on consent until the expiration of this review and comment period. If EPA or DOJ requests or suggests revisions to this Consent Decree or objects to entry of this Consent Decree in the form presented, the Parties shall within ten (10) days meet and confer on whether to revise this Consent Decree in accord with the requested or suggested revisions provided by EPA or DOJ and/or otherwise to accommodate EPA or DOJ's objections. If the Parties do not mutually agree to any such revisions or modifications, the Parties shall so notify the Court and request entry of the Consent Decree in the form drafted. If the Court objects to entry of this Consent Decree in the form presented, the Parties will attempt in good faith to agree to revisions of this Consent Decree necessary so that it is acceptable to the Court.

70. The Effective Date of this Consent Decree shall be the last day for EPA and DOJ to comment on the Consent Decree, i.e., the 45th day following these agencies' receipt of the Consent Decree, or the date on which these agencies provide notice that they require no further review, whichever occurs earlier.

71. This Consent Decree shall terminate three years from the Effective Date provided that Pick-n-Pull has made all monetary payments owed under the Consent Decree and there is no pending Dispute Resolution proceeding pursuant to the provisions of Part XI (DISPUTE RESOLUTION). If Pick-n-Pull has not made all monetary payments owed under the Consent Decree or if there is a pending Dispute Resolution proceeding, the Consent Decree shall be extended until Pick-n-Pull has made all monetary payments owed under the Consent Decree and all pending Dispute Resolution proceedings have been resolved.

72. Pick-n-Pull shall initiate termination by submitting certification to Plaintiff that it has satisfied the conditions of termination set forth in this Part. The Consent Decree shall automatically terminate thirty (30) days from the Plaintiff's receipt of this notice, unless Plaintiff provides written notice to Pick-n-Pull within these thirty (30) days that Plaintiff objects to the certification. If Plaintiff disagrees with Pick-n-Pull's certification, then the matter shall be subject to the Dispute Resolution provisions of Part XI (DISPUTE RESOLUTION).

IN WITNESS WHEREOF, the undersigned have executed this Consent Decree as of the date first set forth above.

**IT IS SO ORDERED:**

Date:  12/18/2015

Honorable Magistrate Judge Paul S. Grewal
UNITED STATES **MAGISTRATE**  JUDGE
NORTHERN DISTRICT OF CALIFORNIA

APPROVED AS TO FORM

ENVIRONMENTAL ADVOCATES

Dated:  Nov. 5,  2015

By: _____
Christopher Sproul
Attorney for Plaintiff

PILLSBURY WINTHROP SHAW PITTMAN LLP

APPROVED AS TO CONTENT

Dated: _Nov. 9_ 2015          By: _____
                                   James Lamport
                                   Title: Executive Director
                                   Ecological Rights Foundation


Dated: _Nov. 5_, 2015         By: _____
                                   Steve Heiskell
                                   Title:  Member, Management Committee
                                   Pick-N-Pull San Jose Auto Dismantlers

**Table 1. Tier One and Two Levels[2] for Facility Discharges**

| Contaminant | Tier One Limit *Applicable Basin Plan value (salt or freshwater dependent)* | Tier Two Limit |
|---|---|---|
| Oil and grease | -- | 15 mg/L |
| Total Suspended Solids | -- | 100 mg/L |
| Chemical Oxygen Demand | -- | 120 mg/L |
| Total Recoverable Copper | 004.8 mg/L (CTR) | 0.0636 mg/L |
| Total Recoverable Lead | 0.010 mg/L (BP) | 0.0816 mg/L |
| Total Recoverable Zinc | 0.020 mg/L(BP) | 0.117 mg/L |
| Total Recoverable Aluminum | -- | 0.750 mg/L |
| Total Cadmium | 0.0002 mg/L (BP) | 0.0159 mg/L |
| Total Recoverable Iron | -- | 1.0 mg/L |
| Total Recoverable Mercury | 0.0001 mg/L (BP) | 0.0024 mg/L |
| Total Recoverable Nickel | 0.0002 mg/L (BP) | 1.417 mg/L |
| Total Recoverable Silver | 0.0019 mg/L (CTR) | 0.117 mg/L |
| pH | -- | 6-9 units |

---

[2] Several of the Numeric Limits are hardness dependent. The hardness dependent limits are in bold. The 2008 EPA Benchmark based limits expressed assume hardness of 101 mg/l CaCO$_3$. Defendants shall adjust the limit using the methods provided in Appendix J of the 2008 EPA Multi-Sector General Permit and/or the California Toxics Rule as applicable.